**2015-1631**

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

═══════════════════════════════════════════════════════════════

**TRIVASCULAR, INC.**

**Appellant,**

**v.**

**SHAUN L.W. SAMUELS,**

**Appellee.**

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in *Inter Partes* Review No. IPR2013-00493.**

_____

**BRIEF OF THE APPELLANT**

_____

David K.S. Cornwell
Richard D. Coller III
Pauline M. Pelletier
STERNE, KESSLER, GOLDSTEIN & FOX, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8580

*Counsel for Appellant Trivascular, Inc.*

Dated: July 6, 2015

## CERTIFICATE OF INTEREST

Counsel for the Appellant <u>David K.S. Cornwell</u> certifies the following:

1.      The full name of every party or amicus represented by me is:

TriVascular, Inc.

2.      The name of the real party in interest represented by us is:

None.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party or amicus curiae represented by me are:

The parent corporation of TriVascular Inc. is TriVascular Technologies, Inc., a publicly held corporation (NASDAQ: TRIV). The following two firms own more than 10% of the outstanding shares of TriVascular Technologies, Inc.: New Enterprise Associates 12, Limited Partnership and Delphi Ventures VIII LP.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in the court are:

STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.: David K.S. Cornwell, Richard D. Coller III and Pauline M. Pelletier.
HOFFMANN & BARON, LLP: Daniel A. Scola, Jr. and Michael I. Chakansky.

Dated:  July 6, 2015           /s/ David K.S. Cornwell

                                    David K.S. Cornwell
                                    STERNE, KESSLER, GOLDSTEIN & FOX, PLLC
                                    1100 New York Avenue, N.W.
                                    Washington, D.C. 20005
                                    (202) 772-8580
                                    (202) 371-2540
                                    davidc@skgf.com

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................1

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE .................................................................2

I.    Introduction.................................................................3

II.   Statement of Facts.................................................................4

    A.    Background .................................................................4

    B.    The Claims .................................................................7

    C.    The Prior Art .................................................................12

        a)    Samuels '851.................................................................13

        b)    Todd .................................................................14

        c)    Lazarus .................................................................15

        d)    Rogers .................................................................16

        e)    Holman.................................................................17

    D.    *Inter Partes* Review.................................................................18

        a)    Institution Decision.................................................................18

        b)    Trial Proceedings .................................................................19

        c)    Final Written Decision.................................................................22

SUMMARY OF ARGUMENT .................................................................24

ARGUMENT .................................................................30

I.    Standard of review.................................................................30

II.   The Board erred in its construction of "circumferential ridges" because, under the broadest reasonable interpretation in light of the prosecution history, the claimed circumferential ridges can be discontinuous. ...............31

    A.    The issued claims encompass circumferential ridges that are discontinuous as a result of prosecution history estoppel..................33

    B.    The Board erred in dismissing the prosecution history, which dictates that the claimed ridges can be discontinuous.....................................35

C.      This affected the Board's obviousness analysis by requiring the skilled artisan to modify Samuels '851 to have "raised strips." .........38

III.    The Board erred in determining that the skilled artisan would not have combined the teachings of Samuels '851 and Todd because it misapplied *KSR*, contradicted itself, and made a decision unsupported by evidence. ....40

A.      The rationale to combine Samuels '851 and Todd is to obtain the predictable and desirable result of non-penetrating stent fixation. .....42

B.      The Board did not find that the references teach away or that there would have been no reasonable expectation of success. .....................46

C.      The Board improperly required bodily incorporation of the references, and ignored the state of the art and its predictability. .........................48

CONCLUSION ......................................................................................................58

CERTIFICATE OF COMPLIANCE .....................................................................60

# TABLE OF AUTHORITIES

## Cases

*Baxter Int'l, Inc. v. McGaw, Inc.*,
  149 F.3d 1321 (Fed. Cir. 1998) ........................................................47

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
  464 F.3d 1356 (Fed. Cir. 2006) ........................................................55

*Fenner Investments, Ltd. v. Cellco Partnership*,
  778 F.3d 1320 (Fed. Cir. 2015) ..................................................33, 35

*Genzyme Corp. v. Transkaryotic Therapies, Inc.*,
  346 F.3d 1094 (Fed. Cir. 2003) ........................................................36

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
  356 F.3d 1348 (Fed. Cir. 2004) ........................................................34

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966)............................................................................43

*In re Chuang*,
  2015 WL 526030 (Fed. Cir. Feb. 10, 2015) .....................................50

*In re Dembiczak*,
  175 F.3d 994 (Fed. Cir. 1999) ..........................................................30

*In re Etter*,
  756 F.2d 852 (Fed. Cir. 1985) ..........................................................49

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................30

*In re Gurley*,
  27 F.3d 551 (Fed. Cir. 1994) ............................................................46

*In re Icon Health & Fitness, Inc.*,
  496 F.3d 1374, 1382 (Fed. Cir. 2007). .............................................43

*In re Keller*,
  642 F.2d 413 (C.C.P.A. 1981)..........................................................49

*In re Merck & Co., Inc.*,
  800 F.2d 1091, 1097 (Fed. Cir. 1986) ................................................................43

*In re Mouttet*,
  686 F.3d 1322 (Fed. Cir. 2012) ...........................................................46, 49, 53

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997) .........................................................................35

*In re Nievelt*,
  482 F.2d 965 (C.C.P.A. 1973) ...........................................................................50

*In re Sneed*,
  710 F.2d 1544 (Fed. Cir. 1983) .........................................................................49

*KSR Int'l Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007) ...............................................................................*passim*

*Litton Sys., Inc. v. Whirlpool Corp.*,
  728 F.2d 1423 (Fed. Cir. 1984) .........................................................................37

*Microsoft Corp. v. Proxyconn, Inc.*,
  2015 WL 3747257 (Fed. Cir. June 16, 2015) ....................................................33

*Mintz v. Dietz & Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012) .........................................................................56

*Perfect Web Techs., Inc., v. Infousa, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009) ...................................................................43, 44

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .........................................................................33

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) ...........................................................30, 55, 56

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) .........................................................................33

*Rohm & Haas Co. v. Crystal Chem. Co.*,
  722 F.2d 1556 (Fed. Cir. 1983) .........................................................................36

*Syntex (U.S.A) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) ..........................................................................47

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ............................................................................35

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015).........................................................................................30

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) .......................................................................46

**Statutes**

35 U.S.C. § 103(a) (2006)........................................................................................43

**Regulations**

37 C.F.R. 1.2 ...........................................................................................................36

**Other Authorities**

2 ANNOTATED PATENT DIGEST § 14:89 ..........................................................36, 37

NATIONAL PARK SERVICES' HISTORIC AMERICAN ENGINEERING RECORD (HAER),
HAER NC,11-ASHV.V,2 (3 of 28) - Blue Ridge Parkway, Between Shenandoah
National Park & Great Smoky Mountains, Asheville, Buncombe County, NC......32

## STATEMENT OF RELATED CASES

This *inter partes* review of U.S. Patent No. 6,007,575 ("the '575 patent") is related to a parallel enforcement action that the Appellee Shaun L.W. Samuels ("Samuels") filed against the Appellant TriVascular, Inc. ("TriVascular"). Samuels sued TriVascular, alleging infringement of the '575 patent. *Samuels v. TriVascular Corporation*, Civ. Action No. 3:13-cv-02261 (N.D. Cal.). This Court's decision in the present appeal will likely affect the pending district court litigation.

## STATEMENT OF JURISDICTION

The U.S. Patent and Trademark Office's ("Office") Patent Trial and Appeal Board ("Board") had jurisdiction over this *inter partes* review proceeding under 35 U.S.C. § 6. The Board issued a Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 on December 3, 2014. TriVascular filed a Request for Rehearing on December 31, 2014. The Board issued a Decision on TriVascular's Request for Rehearing on January 29, 2015. TriVascular filed and timely served a Notice of Appeal on March 30, 2015. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Did the Board err in requiring that "circumferential ridges" be continuous? Yes. Properly construed—under the broadest reasonable interpretation and in light of the prosecution history—the claimed ridges can be discontinuous.

2. Did the Board err in determining that the skilled artisan would not have combined the teachings of the Samuels '851 and Todd references to arrive at the claimed invention? Yes. The Board misapplied *KSR*, contradicted itself, and made a decision that is unsupported by substantial evidence.

## STATEMENT OF THE CASE

Appellee Dr. Samuels owns the challenged patent. Appellant TriVascular is a biomedical device manufacturer based in Santa Rosa, California that designs, develops, and commercializes technologies, such as endovascular grafts, which significantly advance minimally invasive treatment of abdominal aortic aneurysms.

In 2013, Dr. Samuels sued TriVascular alleging infringement of the '575 patent. *Samuels v. TriVascular Corporation*, Civ. Action No. 3:13-cv-02261 (N.D. Cal.). TriVascular filed a petition for *inter partes* review on August 5, 2013. The Board instituted trial on February 4, 2014. (A168, Institution Decision.) The Board issued a final decision on December 13, 2014, concluding that the challenged claims were not unpatentable over the applied art. (A24, Final Decision.)

## I.    Introduction

TriVascular appeals this decision, first, because the Board erred in its construction of the term "circumferential ridge." The Board ignored critical portions of the prosecution history which establish that a "ridge" can be continuous or discontinuous. Accordingly, the Board should have construed this term to mean an elevated part of the outer surface disposed about the inflatable cuff that can be either continuous or discontinuous. Second, TriVascular articulated a legally sufficient rationale for combining the teachings of the applied references, Samuels '851 and Todd. The Board's failure to accept this rationale in its final decision is inconsistent with this Court's precedent and contradicts the Board's own findings.

The Board's claim construction error prevented the Board from accepting that the "inflatable protrusions" disclosed in Samuels '851 can form discontinuous circumferential ridges disposed radially about the inflatable cuff. The Board then incorrectly required TriVascular to explain how Todd could be bodily incorporated into Samuels '851—rejecting the combination as insufficient on this basis. The Board's final decision is also contrary to its preliminary finding, which correctly recognized that there are only a finite number of identified, predictable solutions for achieving vessel fixation with a reasonable expectation of success.

The Board also blinded itself to the state of the art, which establishes that the skilled artisan would have had good reason to pursue the known options within his

or her technical grasp—e.g., to solve the well-characterized problem of affixing a stent without penetrating the vessel wall—because of the benefits flowing from that choice. The stent art is crowded and predicable. The design choices are limited and intuitive. The objective of effectively anchoring a stent without inflicting damage to a vessel wall was similarly well-characterized. Combining the known elements disclosed in the prior art would predictably result in a stent that meets every limitation of Dr. Samuels' claims. That rationale is legally sufficient.

Accordingly, the Board erred in concluding that the challenged claims are not unpatentable over Samuels '851 in view of Todd. Its decision should be reversed based on the Board's own findings. Alternatively, this case should be remanded for the Board to consider the prior art under the correct construction.

## II.    Statement of Facts

### A.    Background

Stenting has been a commonplace medical procedure since the early 20th century. The stent art is crowded and includes various designs used to treat everything from aneurisms to coronary disease. A stent is a collapsible tube that is guided to a lumen in the body and expanded. (A47, '575 patent, 1:1-42.) When deployed, a stent can be expanded radially by various means, such as an inflatable balloon positioned within the stent, to fill an intraluminal space. (A47, *id.*, 1:29-38.) An expanded stent scaffolds a surrounding vessel to prevent occlusion of the

vessel. (*Id.*) Once deployed, a stent should remain fixed in position and not migrate. (A47, *id.*, 1:39-42.) One way to accomplish this is by adding a hook or barb to the outer surface of the stent. Upon expanding the stent, the hook or barb expands radially and penetrates the vessel wall, securing the stent. Another way to affix the stent is by adding non-penetrating gripping protuberances. When the stent is expanded, the protuberances grip the vessel wall to secure the stent in place.

The chart below illustrates the state of the art in stent design around the time Dr. Samuels filed the application that led to the '575 patent. (*See also* A71-80, Petition.) In addition to using an inflatable balloon positioned within the stent to achieve expansion, it was well-known to use a stent that was itself inflatable. (*See, e.g.*, A510, Samuels '851, Abstract; A536, Lazarus, 14:21-31; A542, Rhodes, Abstract; A517, Rogers, Abstract; A569, Miller Jr., 1:26-44, 2:18-29; A594, Sisson, Abstract; A608, Pigott, 4:4-24.) Typical design choices for achieving fixation against a vessel wall included modifying the stent surface by adding features, e.g., nubs, bumps, ridges, lattices, or other protrusions, that when inflated outwards create tension with the surrounding vessel wall. (*See, e.g.*, A565, Lane, 5:17-31; A587-88, Todd, 6:58-7:53, A592, *id.*, 15:1-26; A622-23, Holman, 2:58-3:45; A532, Lazarus, 5:32-40, A536, *id.*, 14:21-31.) It was also common during this time to use pins, surgical staple-like clips, or exposed barbs to secure the stent in place. (*See, e.g.*, A47, '575 patent, 1:53-59; A514, Samuels '851, 1:48-57.)



FIG. 4     FIG. 5     FIG. 6

**Lane (1994)**

FIG. 1

FIG. 2

**Holman (1996)**

**Rogers (1994)**

FIG. 4

FIG. 9

**Samuels 851 (1994)**

**Rhodes (1996)**

FIG. 8

**Todd (1994)**

**Lazarus (1995)**

(*See also* A561, Lane: A518, Rogers; A616-17, Holman; A548, Rhodes;  A580-82,

Todd; A526, Lazarus; A512, Samuels '851) (illustrating various stent designs.)

The objective of effectively anchoring a stent without inflicting damage to, or penetrating, a vessel wall was well-characterized by the time Dr. Samuels filed his patent application. (A71-115, Petition.) (*See also* A530, Lazarus, 1:52-64; A552, Rhodes, 2:29-39, 2:55-61; A569, Miller Jr., 1:31-56, A571, *id.*, 6:6-10; A585, Todd, 2:35-43, A587, *id.*, 4:61-5:6, A591, *id.*, 14:9-24; A510, Samuels '851, Abstract; A607, Pigott, 1:57-68.) Others had proposed solutions including adding gripping protuberances to the outer surface of the stent, thereby eliminating the need for hooks or barbs. (*See, e.g.*, A575, Todd, Abstract, A587-88, *id.*, 6:58-7:53.)

While Dr. Samuels proposed his own solution to this well-defined problem in 1997, he did not claim sufficiently distinctive features to distinguish his idea from the prior art. As a result, the claims of the '575 patent read broadly on stent designs that would have been obvious to the skilled artisan in view of the prior art.

## B.    The Claims

The independent claims of the '575 patent are directed to an inflatable stent comprising "an inflatable and deflatable cuff" having a "friction enhancing outer surface." (A49, '575 patent, 6:47-67.) The friction-enhancing outer surface is designed to prevent the cuff from moving after the cuff is inflated. (A48, *id.*, 3:33-41.) The friction-enhancing outer surface can take several forms. For example, it may include ridges, nubs, bumps, indentations, etc. disposed about the cuff. (A48, *id.*, 3:33-67) ("any friction-enhancing outer surface, that would secure the inflated

7

stent to the interior wall could be used.") (*See also* A39, *id.* at Figure 3.)



Claim 1 of the '575 patent is illustrative and recites:

> 1. An inflatable intraluminal stent adapted to be secured to the interior of a tubular structure within the human body comprising:
>
> a) an inflatable and deflatable cuff of generally hollow cylindrical continuation having a collapsible lumen, an inner surface, an inlet, an outlet and a friction enhancing outer surface, *said friction-enhancing outer surface featuring inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff*, said friction-enhancing outer surface engaging the interior of the tubular structure without penetration to prevent the cuff from moving in a longitudinal direction with respect to the tubular structure when said cuff is in a fully inflated condition;
>
> b) means for injecting an inflation material into said cuff to inflate it; and
>
> c) a valve integral with the inflatable cuff for permitting entry of the inflation material from the means for injecting and thereafter sealing said cuff to prevent deflation.

(A49, *id.*, 6:47-67) (emphasis added.)

During prosecution of the application that led to the '575 patent, the original independent claims did not include the limitations "wherein the friction-enhancing outer surface includes inflatable protrusion(s)" (original prosecution claim 3) or "wherein the inflatable protrusions(s) include at least one circumferential ridge disposed about said inflatable cuff" (original prosecution claim 4). (A1095-1100, Original Prosecution Claims.) Rather, these features were added to the independent claims in an attempt to distinguish them from Dr. Samuels' own prior art, U.S. Patent No. 5,423,851 ("Samuels '851"), which the examiner applied as an anticipatory reference. (A1112-16, Office Action; A1119-28, Amendment B.)

During prosecution, the examiner rejected all of the original claims as being anticipated by Samuels '851. (A1115, Office Action.) Importantly, the examiner expressly interpreted elements 12 and 18 of Samuels '851, captioned below, as "inflatable protrusions" that form a "circumferential ridge." (*Id.*) ("Examiner is interpreting the protrusions (elements 12 and 18) to form a circumferential ridge.")



9

In response, Dr. Samuels argued that elements 12 and 18 of Samuels '851 did not form a "*continuous*" circumferential ridge, and amended original claim 4 to recite "wherein the inflatable protrusion(s) include at least one circumferential ridge <u>continuously</u> disposed about said inflatable cuff." (A1122-24 Amendment B.) Thus, Dr. Samuels did not refute or disagree that inflatable protrusions 12 and 18 of Samuels '851 formed circumferential ridges. Rather, Dr. Samuels accepted the examiner's finding that Samuels '851 discloses inflatable protrusions forming a circumferential ridge, (A1115), amended the claims, (A1122), and argued the distinction that "the protrusions 12 and 18 of the Samuels '851 patent do not form a continuous circumferential ridge." (A1123-24.)

In doing so, Dr. Samuels' arguments and amendments distinguished between two types of circumferential ridges: the *continuous* circumferential ridges of the amended claims and the *discontinuous* circumferential ridges of Samuels '851. (*See* A67-70, Petition; A352-54, Petitioner's Reply; A334-36, Petitioner's Opposition to Motion to Amend; A488-96, Petitioner's Request for Rehearing.)

Dr. Samuels accepted that "when the cuff of the Samuels '851 patent is fully inflated, the recesses 12 pop out so that the barbs 18 *penetrate* the wall." (A1123, Amendment B) (emphasis in original.) In response, he amended original claim 3 to state that it does not include a rigid component, changing "inflatable protrusion(s)" to "inflatable protrusion(s) <u>without rigid components</u>." (A1122, Amendment B.)

Dr. Samuels confirmed the intent of his amendment in the written record,

accompanying Amendment B with the following explanation in response:

> Dependent claims 3 and 18 have been amended to more
> clearly recite that the inflatable protrusions of the cuff *do*
> *not feature **rigid components** such as the barbs 18 of the*
> *Samuels '851 patent*. Furthermore, dependent claim 4,
> which is dependent upon claim 3, *specifies that the*
> *circumferential ridge is **continuously** disposed about the*
> *inflatable cuff*. The Examiner stated in the subject Office
> Action that the protrusions 12 and 18 of the Samuels
> '851 patent are interpreted as forming a circumferential
> ridge. Applicant respectfully submits that the protrusions
> 12 and 18 of the Samuels '851 patent *do not form a*
> ***continuous ridge***.

(A1123-24, Amendment B) (emphasis added.)

After conducting a telephone interview with the examiner, Dr. Samuels

cancelled the claims at issue and added new ones. (A1131-35, Amendment C.) He

characterized the new claims as "rewritten . . . to incorporate the limitations of

claims 3 and 4 (with claims 3 and 4 in the form originally presented, that is,

*without the changes of previously filed Amendment 'B'*)." (A1135, Amendment C)

(emphasis added.) The examiner allowed the claims in this condition. (A1138-42,

Notice of Allowability.) No interview summary issued. (A1139, *id.*) (unchecked

box, PTO-413.) These claims issued in the '575 patent. (A49-50, '575 patent.)

11

In sum, the phrase "*continuous* circumferential ridge"—which Dr. Samuels added specifically to overcome Samuels '851—is *not present* in any of the '575 patent claims. Nor is the phrase "without rigid components," which Dr. Samuels also added specifically to distinguish Samuels '851. By allowing the claims to issue without these requirements, Dr. Samuels abandoned the right to distinguish prior art ridges that are discontinuous or that contain a "rigid component."

Accordingly, by prosecution history estoppel, the issued claims encompass circumferential ridges that are discontinuous, and that include a rigid component.

## C.    The Prior Art

The prior art speaks to what the skilled artisan would have understood, what substitutes were readily available, and the level of predictability in the art.

The prior art includes the applied references, Samuels '851 and U.S. Patent No. 5,423,745 to Todd *et al.* ("Todd"). Both Todd and U.S. Patent No. 5,693,088 to Lazarus ("Lazarus") describe stents or grafts that are secured in place while avoiding penetrating the vessel wall. While Samuels '851 employs barbs, it would have been obvious to consider replacing them with gripping protuberances.

Doing so would have been no more than exercising a choice among a finite number of identified, predictable solutions, routinely considered in the art at the time of the alleged invention. The choice would have achieved the well-understood objective of effectively anchoring a stent without damaging the surrounding vessel

wall. And there would have been a reasonable expectation of success in replacing barbs with gripping protuberances and achieving the claimed objective. U.S. Patent No. 5,534,024 ("Rogers") and Lazarus additionally exemplify the state of the art as it relates to friction-enhancing inflatable features, such as the claimed inflatable protrusions. U.S. Patent No. 5,871,537 ("Holman") is exemplary of the state of the art with respect to the use of circumferential ridges, and is a reference the Board considered cumulative to Todd. (A192, Institution Decision.) TriVascular raised each reference before the Board. (*See, e.g.*, A55, 59-61, 114-15, Petition.)

### a)    *Samuels '851*

Samuels '851 teaches all the elements of the challenged claims except that Samuels '851 uses rigid penetrating barbs to prevent the cuff from moving. In its pre-deployment state, the barbs 18 of Samuels '851 are recessed within inflatable protrusions "radially arrayed" in a series of circumferential ridges around the cuff. (A514, Samuels '851, 2:55-64.) When Samuels '851 is deployed, the recesses 12 are inflated and project outwards, delivering the rigid barbs 18 to the vessel wall and securing the stent in place. (*Id.*) ("When cuff 10 is fully inflated, the recesses 12 pop out to allow the barbs 18 to engage with the wall.") This is illustrated by Figures 3 and 4 of Samuels '851, captioned below. (A512, *id.*) (depicting two states—pre-deployment (Figure 3) and deployment (Figure 4)—Figure 4 showing the state in which recesses 12 have protruded outward to meet the vessel wall.)



FIG. 3              FIG. 4

### b)    *Todd*

Todd discloses rigid "[g]ripping means for securely gripping the walls of a body passageway in order to secure [a] catheter in place within the passageway." (A586, Todd, 4:16-18.) Todd's preferred embodiment comprises "a plurality of protuberances that project outwardly from the outer surface of [a] balloon." (A587, *id.*, 6:59-60.) Todd describes the rigid protuberances as "soft enough to grip the walls of the body passageway without damaging the tissues." (A587, *id.*, 6:66-68.)

Todd explains that "various configurations of protuberances will accomplish the teachings of the present invention." (A587, *id.*, 6:60-66.) As shown below, Figures 5-8 of Todd illustrate various configurations of protuberances. (A587, *id.*, 6:68-7:2.) Figure 5 shows a series of knobs which grip the walls. (A588, *id.*, 7:4-32.) Figure 6 shows a cross-hatched pattern projecting from the exterior surface. (A588, *id.*, 7:32-35.) Figure 7 shows an outwardly projecting spiral ridge. (A588, *id.*, 7:36-40.) Figure 8 illustrates "protuberances . . . in the form of outwardly projecting annular rings 52 wound about the exterior surface of the balloon 26."

14

(A588, *id.*, 7:41-43.) Todd states: "[A]nnular rings 52 assist in maintaining contact between an inflated balloon 26 and the walls of the body." (A588, *id.*, 7:44-47.)



FIG. 5

FIG. 6

FIG. 7

FIG. 8

### c)    *Lazarus*

U.S. Patent No. 5,693,088 ("Lazarus") discloses an intraluminal vascular graft "to be deployed within a vessel for incorporation therein without use of hooks or barbs." (A524, Lazarus, Abstract.) Lazarus explains that "hooks or barbs may damage the vessel, particularly where the vessel is weakened already by an aneurysm or other disease condition." (A530, *id.*, 1:56-59.) The graft is comprised of a biocompatible tube and a "non-puncturing attachment means." (A530, *id.*,

2:51-52.) The "attachment means" of Lazarus "may be a toroidal collar having an internal inflatable space which facilitates expansion of the intraluminal vascular graft to contact the inner surface of the vessel." (A532, *id.*, 6:39-42.)



Figure 3 of Lazarus, captioned above, depicts a toroidal (doughnut-shaped) inflatable collar 50 disposed about the circumference of tubular body 12. (A536, *id.*, 14:20-23.) Fluid is pumped through an inflation conduit 56 attached via a closeable valve 58 to inflate the collar. (A537, *id.*, 15:15-31.) Upon removal of the inflation conduit, the valve closes, sealing the fluid within internal space 52.

### d)    Rogers

Rogers discloses an intraluminal stenting graft that expands into a round and open cylindrical shape, affixing itself without penetrating the vessel wall. Rogers has inflatable cylindrical ridges disposed about an inflatable cuff. As shown in Figures 1 and 2, the outer layer 18 is joined to the inner layer 20 to form a plurality of cylinders 30 that extend longitudinally between the cuff ends. (A522, Rogers, 2:33-48.) Radially extending chamber 32 is in fluid or air communication with the

plurality of cylinders via opening 40. When fluid or air is received, it causes the

collapsed tube 12 to expand for purposes of implantation. (*Id.*)



### e)    Holman

Holman discloses a non-invasive graft that may be expanded and made rigid,

as well as circular, using a chemical hardening agent introduced into either a single

spiral tube or multiple interconnected cylindrical tubules 40 attached to, as well as

encasing, the sleeve 10. (A624, Homan, 5:13-19, Figures 3, 4.) Holman explains

that polymers or polymeric systems fill tubules 40, causing them to expand and

rigidify, thereby fixing the sleeve at the site of repair without penetration. (*Id.*)



### D.    *Inter Partes* Review

After Dr. Samuels sued TriVascular in the Northern District of California, TriVascular filed a petition for *inter partes* review with the Office, challenging claims 1-24 of the '575 patent. (A56, Petition.)[1] The Board instituted trial on the combination of Samuels '851 and Todd as well as the combination of Lazarus and Todd, providing claim constructions and setting forth its preliminary fact findings.

During trial, Dr. Samuels submitted his response, including declarations from himself and Dr. Timothy W.I. Clark. TriVascular deposed both declarants and provided a substantive reply. The Board held an oral hearing during which it presaged a shift in its views concerning both the meaning of the term "inflatable protrusions," as well as what Samuels '851 and Todd could be relied upon to teach.

In its final decision, the Board affirmatively changed its mind—construing additional claim terms for the first time and contradicting its prior findings.

### a)    *Institution Decision*

Before reaching the merits of the petition, the Board construed several claim terms, some of which remain in dispute. First, the Board construed "friction-enhancing outer surface" to mean "surface features of an outer surface that increase the capability of the outer surface to engage or grip another surface." (A175,

---

[1] Claims 1, 14, and 23 are the independent claims. Each of the independent claims contains the disputed limitation, a "friction-enhancing outer surface featuring inflatable protrusion(s) including at least one circumferential ridge."

Institution Decision.) Second, it construed a "circumferential ridge disposed about the inflatable cuff" to mean a "raised strip disposed circumferentially about the outer surface of the inflatable cuff." (A175-76, *id.*) The Board did not construe the term "inflatable protrusion(s)" in its institution decision, stating that any remaining terms would be given their ordinary and customary meaning. (A177, *id.*)

The Board initially agreed with TriVascular that Todd's "protuberances" taught the claimed inflatable protrusions, and that it would have been obvious to substitute Todd's protuberances for the barbs of Samuels '851 because both are friction-enhancing surfaces used for attachment to a vessel. (A181-184, *id.*) (citing A77, Petition.) As such, the skilled artisan could have replaced barbs with gripping protuberances to obtain the predictable result of non-penetrating protrusions, with a reasonable expectation of success in achieving stent fixation. (*Id.*) With respect to Lazarus, the Board similarly concluded that, because Lazarus teaches the use of materials designed to enhance attachment to a vessel without barbs or other penetrating devices, as does Todd, that TriVascular provided adequate articulated reasoning with rational underpinning to support the combination. (A188, *id.*)

### b)    *Trial Proceedings*

Along with his response, Dr. Samuels submitted a declaration, signed by himself, attesting emphatically to the novelty of his stent and what he meant by "inflatable protrusions." (A2111-13, Samuels Decl.) Dr. Samuels also sought to

distance the challenged claims from the teachings of Samuels '851 by asserting that—as the inventor—he knew that his prior patent "mandated the positively engaging barbs such that, without the barbs, there was no invention and no patent would have issued" and "[a]ny suggestion to replace the barbs with a simple friction engagement would not only avoid the invention but merely recreate what was known in the art before my invention." (A2111, Samuels Decl., ¶ 4.)

TriVascular rebutted this contention in its reply, explaining that the common intent and purpose of the barbs of Samuels '851, which are bonded to the inflatable protrusions, and Todd's ridges are to firmly secure the stent in one position in the lumen of the tubular structure. (A358-61, Petitioner's Reply.) As the Board found, it would have been obvious to the skilled artisan to replace the barbs of Samuels '851 with Todd's protuberances (e.g., the outwardly projecting annular rings 52 of Figure 8) because "the protuberances and the barbs are each friction-enhancing features used for attachment to a vessel." (A182, Institution Decision.) And, the skilled artisan would consider doing so to achieve non-penetrating stent fixation.

Dr. Samuels had argued that "the removal of the barbs from the arrangement in Samuels '857 [sic] will certainly increase the tendency for potential migration of the device to an undesired location." (A264-65, Patent Owner's Response.) But, Dr. Samuels' argument ignored that the barbs could have been *replaced* with another suitable friction enhancing surface, e.g., Todd's gripping protuberances.

20

TriVascular explained this again during the oral hearing before the Board. (A440, Hearing Tr. 12:7-20.) ("[COUNSEL]: To combine in an obviousness determination the functions of an element of annular rings of Todd, which provide gripping to the Samuels '851, is obvious if one takes a look at the '851 and recognizes that in the construction of the '851 apparatus, one starts with inflatable recesses, okay, and then one bonds the barbs to it. So, if one simply did not have to remove it, simply did not add the barbs to the '851, one would have an inflatable cuff with a friction-enhancing inflatable protrusions on its surface used to position and affix the stent in position in the blood vessel.") When the Board asked whether TriVascular was relying on Samuels '851 for disclosure of an inflatable protrusion, counsel for TriVascular explained that testimony elicited from Dr. Clark during cross-examination confirmed that even he viewed Samuels '851 as disclosing inflatable protrusions. (A440-41, *id.*, 12:21-13:21.) TriVascular then explained where it advanced this in its petition. (A442-43, id., 14:6-15:7) (citing A81-115.)

In its petition for *inter partes* review, TriVascular asserted that "the phrase 'continuous circumferential ridge,' which was used to overcome Samuels '851 [during prosecution], is not present in any of the . . . claims for which *inter partes* review is requested." (A67-70, Petition.) In its reply, TriVascular again asserted that "Patent Owner did not argue that elements 12 and 18 [of Samuels '851] did not form 'a circumferential ridge,' only that elements 12 and 18 did not form a

continuous circumferential ridge and amended the claims to avoid same." (A354, Petitioner's Reply.) TriVascular argued that "[the] claims, which must be given their broadest reasonable construction absent these limitations, must be construed as follows: (i) elements 12 and 18 of Samuels '851 are 'inflatable protrusions' with or without barbs, with or without non-inflatable ridges, and that (ii) elements 12 and 18 of Samuels '851 form inflatable circumferential ridges. (*Id.*)

### c)    *Final Written Decision*

Despite committing the parties to present evidence consistent with its earlier claim constructions and preliminary fact findings, the Board changed its mind.

In its final decision, the Board adopted Dr. Samuels' narrow construction of "inflatable protrusions," and limited this term for the first time to "protrusions that are themselves inflatable, i.e., expandable by being filled with fluid." (A10, Final Decision.) The Board applied that construction even more narrowly to Todd, concluding that "the protuberances . . . are not in fluid communication with the balloon's inner chamber." (A16, *id.*) In effect, the Board sided against TriVascular for not proving in its petition that Todd teaches "inflatable protrusions" consistent with the unexpectedly narrow construction it announced in its final decision.

However, TriVascular had also argued that Samuels '851 teaches inflatable protrusions, which Dr. Clark agreed are "themselves" inflatable consistent with the Board's construction. (A356-57, Petitioner's Reply) (citing A1625-26, Clark Dep.

22

Tr. 130:23-131:5, 131:6-14, A1630, *id.*, 135:6-16.) But the Board rejected this contention as well, concluding that "Trivascular has not provided a sufficient rationale to support substituting the ridges of Todd for just the barbs of Samuels '851." (A19, Final Decision.) In stating this, the Board did not acknowledge its previous finding that the barbs of Samuels '851 and Todd's protuberances are both friction-enhancing surfaces, and that in combination they yield the predictable result of a non-penetrating friction-enhancing surface. (A182, Institution Decision) ("[I]t would have been obvious to a person of ordinary skill in the art to substitute Todd's protuberances (such as outwardly projecting annular rings 52 of Figure 8) for the barbs of Samuels '851, because the protuberances and the barbs are each friction-enhancing features used for attachment to a vessel.")

The Board's rejection of the Samuels '851-and-Todd combination rested upon this error; namely, the Board's determination that a "circumferential ridge" cannot be made up of a series of discontinuous inflatable protrusions formed circumferentially about the cuff. As a result of this misunderstanding, the Board rejected TriVascular's contention that the skilled artisan would have considered replacing *just the barbs* of Samuels '851 with the gripping protuberances of Todd to produce a non-penetrating friction-enhancing surface. (A18-19, Final Decision.) The Board erred because, doing so would have been no more than choosing among a finite number of identified, predictable solutions, routinely considered in the art

at the time of the alleged invention. (*See, e.g.*, A182-83, Institution Decision.) As TriVascular showed, there were well-known ways to effectively anchor a stent without inflicting damage to a vessel wall. And, as such, the skilled artisan would have had a reasonable expectation of success in achieving the claimed objective.

The Board rejected this reasoning despite previously agreeing that the skilled artisan would have combined Samuels '851 and Todd to come up with a non-penetrating friction enhancing surface. (A182-83, Institution Decision.) The Board did not point to evidence supporting its changed opinion, nor did it reconcile its prior finding with its final decision. Finally, the Board refused to consider this on rehearing, denying TriVascular's request. (A28-34, Rehearing Decision.)

## SUMMARY OF ARGUMENT

During original prosecution of the application resulting in the '575 patent, Dr. Samuels amended his then-pending claims to distinguish Samuels '851 on the basis that the circumferential ridges it discloses are not "continuous." (A1119-26, Amendment B.) After an unsummarized telephone interview, the examiner allowed the independent claims *without* the "continuous" limitation. The issued claims cannot be construed to exclude discontinuous ridges, or be found distinguishable over the *same reference* based on the unclaimed limitation. The amendment adding the term "continuous" was a bell that cannot be unrung. And the omission of that adjective from the issued claims means they cannot bear such a distinction. Dr.

Samuels does not dispute that he made the amendment. Nor does he dispute that the issued claims omit this word. As a result, the Board erred in construing the term narrowly to mean "a raised strip (as of plowed ground)," and finding the claims distinguishable from prior art that discloses circumferentially disposed inflatable protrusions that are discontinuous. (A28-32, Decision on Rehearing.)

The Board held in error that the amendment adding the term "continuous," and the arguments accompanying it, have no legal consequence because "the positions of the Examiner and the patent applicant changed following a telephone interview." (A30-31, *id.*) As an initial matter, nothing is documented in the file history about the contents of the interview beyond the fact that it happened— providing no proof that the examiner's position "changed" with respect to what Samuels '851 discloses. (A30, *id.*) (citing A1131-37, Amendment C; A1138-42, Notice of Allowability.) Rather, the examiner expressly interpreted Samuels '851 as teaching inflatable protrusions forming circumferential ridges, (A1115), Dr. Samuels' expressly amended the original claims to overcome Samuels '851 on that basis (A1123-24), and neither the examiner nor Dr. Samuels entered an interview summary—or otherwise documented the substance of the interview (A1139)—to indicate on the written record that the examiner "changed" his position. As such, the Board's determination that the claims are not broad enough to encompass discontinuous ridges based on the prosecution history is unsupported by evidence.

We can only imagine what transpired during the interview because nothing meaningful was placed into the written record. Suffice it to say the public is only on notice of Dr. Samuels' view that while "continuous circumferential ridges" may distinguish Samuels '851, mere "circumferential ridges" do not—regardless of whatever other features may have persuaded the examiner to allow the independent claims. Dr. Samuels did not retract the amendment, and the examiner did not withdraw the rejection. Thus, the public is entitled to rely on that affirmative and unequivocal act by the patentee, and the Board erred in holding otherwise.

The Board's construction of circumferential ridge is incorrect and not harmless because it excludes the possibility of having discontinuous protrusions intermittently disposed—like the Blue *Ridge* Mountains—circumferentially about the cuff. Its construction impacted its assessment of Samuels '851 and, in turn, its assessment of whether the skilled artisan would have combined it with Todd.

In defending its final decision, the Board also asserted that TriVascular did not "explain in the Reply how its arguments relating to the prosecution history and Samuels '851 might bear on either is proposed claim construction as set forth in the Petition, or our interpretation of 'ridge' as a 'raised strip.'" (A30, Rehearing Decision.) Here, the Board overlooked that TriVascular's arguments bear directly on whether the Board properly adopted the broadest reasonable interpretation, such that "circumferential ridges" must also include ridges that are discontinuous, or

intermittently disposed circumferentially about the cuff. The Board framed and applied its "raised strip" construction in a manner that excluded discontinuous ridges. (A189, Institution Decision) ("Petitioner has not persuaded us that Samuels '851 discloses or suggests 'at least one circumferential ridge disposed about the inflatable cuff,' as construed above, *because the recesses 12 do not form a raised strip*") (emphasis added); (A18, Final Decision) (rejecting "that recesses 12 of Samuels '851 satisfy the requirement of independent claims 1, 14, and 23 for 'inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff'") (citing A81-82, Petition (element 1a-3), A95-96, *id.* (element 1a-3)); (A31, Decision on Rehearing) (rejecting TriVascular's contention by alleging that "TriVascular . . . did not argue, much less establish, that Samuels '851 discloses a *raised strip* disposed circumferentially about the outer surface of an inflatable cuff, *as required by our claim interpretation*.") (emphasis added.)

The alleged "procedural infirmity" with TriVascular's challenge on this issue is without foundation. (A30, Rehearing Decision.) The issue of whether circumferential ridges can be discontinuous has been at issue in this proceeding since day one. (A64-65, 67-70, Petition.) The Board's failure to appreciate the significance of the prosecution history is precisely the point. And TriVascular has maintained its claim construction position consistently through the present. (*Id.*; A352-361, Petitioner's Reply; A473-74, Hearing Tr., 45:16-46:17; A488-97,

Request for Rehearing; A504-505, Notice of Appeal.) Just because the Board refused to consider the argument, does not mean TriVascular abandoned it.

As such, the Board's charge that "TriVascular's Reply did not contest distinctly our determination in the Institution Decision" is both inaccurate and unfair. (A30, Rehearing Decision.) TriVascular did everything possible to preserve this issue, including requesting rehearing to give the Board an opportunity to reconsider its construction. Instead, the Board confirmed that it does not view the prosecution history as informing the meaning of "circumferential ridge" and reaffirmed its narrow interpretation excluding discontinuous ridges. (A28-32, *id.*)

The erroneous construction also bears directly on the Board's obviousness analysis because it explains why the Board rejected TriVascular's rationale for combining the teachings of Samuels '851 with those of Todd—a rationale it had previously accepted. (A182-83, Institution Decision.) TriVascular showed that Samuels '851 also teaches inflatable protrusions and that, for the same reasons the Board previously accepted, (*id.*), it would have been obvious to replace *just the barbs* of Samuels '851 with Todd's rigid gripping protuberances. (*See, e.g.*, A81-115, Petition; A358-61, Petitioner's Reply; A440, Hearing Tr. 12:7-20, A440-41, *id.*, 12:21-13:21; A488-502, Request for Rehearing.) The Board dismissed this argument based solely on the irrelevant observation that "[a]t oral argument, TriVascular was unable to explain why anyone would use the recesses of Samuels

'851 in the proposed combination of Samuels '851 and Todd." (A19, Final

Decision.) The Board's charge is unreasonable in view of the record.

Indeed, this "gotcha" is the only reasoning supporting the Board's decision

to ignore its prior finding; namely, its finding that the skilled artisan would have

considered replacing the barbs of Samuels '851 with Todd's protuberances because

"the protuberances and the barbs are each friction-enhancing features used for

attachment to a vessel" and doing so would have achieved the well-characterized

objective of using non-penetrating protrusions to affix the stent to the vessel wall.

(A181-183, Institution Decision.) Moreover, the Board erred as a matter of law by

requiring that Samuels '851 and Todd be bodily incorporated into one another in

order to support the combination. That is not the test. And TriVascular's proposed

rationale was legally sufficient by the Board's own account. The Board should not

have second guessed itself and rested its conclusion on inconsistent reasoning.

In rebuffing the rationale for substituting Todd's protuberances for just the

barbs of Samuels '851, the Board also ignored the state of art. (A17-20, Final

Decision.) There is no teaching away and no disproved reasonable expectation of

success. The Board expressly found otherwise. (A181-184, Institution Decision.)

The technology here is easily understandable. The prior art on its face contradicts

all of Dr. Samuels' irrelevant testimony. The skilled artisan could have chosen

from a finite number of identified, predictable solutions, routinely considered in

the prior art. (A182-83, *id.*) The record shows that the objective of effectively anchoring a stent without inflicting damage to a vessel wall was well-known, and that employing non-penetrating rigid protuberances could have been done with a reasonable expectation of success in achieving the claimed objective. Thus, the Board misapplied *KSR* and erred by ignoring evidence of the state of the art. *See generally Randall Mfg. v. Rea*, 733 F.3d 1355, 1362-63 (Fed. Cir. 2013).

As such, the Board erred in concluding that the challenged claims are not unpatentable over Samuels '851 in view of Todd. Its decision should be reversed, or alternatively, remanded to consider the prior art under the correct construction.

## ARGUMENT

### I.     Standard of review.

This Court reviews the Board's ultimate claim constructions de novo and its underlying factual determinations involving extrinsic evidence for substantial evidence. *See Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-42 (2015). In this case, the intrinsic record fully determines the proper construction, and thus the Board's claim construction is reviewed de novo.

The ultimate determination of obviousness is a question of law. *See In re Dembiczak*, 175 F.3d 994, 998 (Fed. Cir. 1999). The factual findings underlying the Board's obviousness determination are reviewed by this Court for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

**II.    The Board erred in its construction of "circumferential ridges" because, under the broadest reasonable interpretation in light of the prosecution history, the claimed circumferential ridges can be discontinuous.**

The question for the Court is whether the Board erred in construing the term "circumferential ridge" to mean "a raised strip (as of plowed ground)," excluding the possibility of having discontinuous inflatable protrusions intermittently disposed circumferentially about the inflatable cuff. (*See, e.g.*, A175-76, 189, Institution Decision; A5-6, 18, Final Decision; A31, Decision on Rehearing.)

Dr. Samuels amended his claims during prosecution to distinguish the same primary reference applied here, Samuels '851, on grounds that it does not disclose circumferential ridges that are also—and specifically—"continuous." (A1119-26, Amendment B.) The claims at issue in this proceeding omit that adjective and must therefore be broad enough to encompass continuous as well as discontinuous circumferential ridges. Anyone who has had the pleasure of visiting the nearby and aptly named Blue *Ridge* Mountains will have observed how this famous "ridge" is not a raised strip of granite, but rather a discontinuous series of granite protrusions.



Source NATIONAL PARK SERVICES' HISTORIC AMERICAN ENGINEERING RECORD (HAER), HAER NC,11-ASHV.V,2 (3 of 28) - Blue Ridge Parkway, Between Shenandoah National Park & Great Smoky Mountains, Asheville, Buncombe County, NC, available at http://www.loc.gov/pictures/item/nc0478.sheet.00003a/.

Inconsistent with this, the Board applied its unduly restrictive interpretation of "circumferential ridge" to reject TriVascular's rationale for combining the teachings of Samuels '851 with those of Todd, skeptically questioning whether the "circumferential ridge is running through the recesses?" or if the skilled artisan would "eliminate the recesses, eliminate the barbs, and just have a circumferential ridge around the surface." (A444-45, Hearing Tr., 16:11-17:15.)

32

The Court should reverse the Board's construction and apply the broadest reasonable interpretation in light of the prosecution history, namely to construe "circumferential ridge" to mean an elevated part of the outer surface disposed about the inflatable cuff that may be continuous or discontinuous. TriVascular has advocated this construction since day one of the proceeding, based on the same prosecution history argument presented here and based on the broadest reasonable interpretation standard. The Board is obligated to apply that claim construction standard uniformly, consistently, and correctly in *inter partes* review proceedings. *See Microsoft Corp. v. Proxyconn, Inc.*, 2015 WL 3747257, *6-7 (Fed. Cir. June 16, 2015) (explaining that application of the broadest reasonable interpretation still requires a legally correct construction, consistent with settled principles).

### A. The issued claims encompass circumferential ridges that are discontinuous as a result of prosecution history estoppel.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Investments, Ltd. v. Cellco Partnership*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (citing *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011)).

33

"Prosecution history estoppel . . . is not limited to the applicant's own words, but may embrace as well the applicant's responses to the examiner's actions. If the patentee does not rebut an examiner's comment or acquiesces to an examiner's request, the patentee's unambiguous acts or omissions can create an estoppel." *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1357 (Fed. Cir. 2004).

Here, during original prosecution, the examiner expressly interpreted Samuels '851 as having "inflatable protrusions" that form a "circumferential ridge." (A1115, Office Action.) In response, Dr. Samuels argued that those elements did not form a "*continuous*" circumferential ridge—amending original prosecution claim 4 in response to recite "wherein the inflatable protrusion(s) include at least one circumferential ridge <u>continuously</u> disposed about said inflatable cuff." (A1122, Amendment B.) Dr. Samuels both acquiesced to the rejection and amended the claims expressly to distinguish Samuels '851 on this basis. (A1123-24, *id.*) He did not later retract the amendment from the written record. Nor did the examiner withdraw the rejection. To the contrary, when incorporating original claims 3 and 4 into the new independent claims, Dr. Samuels specified that they would be incorporated *without* the limitations added in Amendment B. (A1135, *id.*) And the claims issued without the limitations.

Thus, the amendment of original claim 4, followed by express abandonment of that specific limitation in the issued claims, informs the scope and meaning of

the term "circumferential ridge." It requires that the term encompass ridges that are discontinuous. This interpretation is consistent with the ordinary meaning of the term, which includes a "raised strip" *as well as* a ridge having peaks.

### B. The Board erred in dismissing the prosecution history, which dictates that the claimed ridges can be discontinuous.

The import of this principle of construction is that "the interested public has the right to rely on the inventor's statements made during prosecution, without attempting to decipher whether the examiner relied on them, or how much weight they were given." *Fenner Investments*, 778 F.3d at 1325. This applies even when the prosecution history dictates a broader meaning. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (explaining that the prosecution history supported leaving out multiple limitations not supported by the intrinsic record). And the principle applies equally for purposes of claim construction before the Office. *Id.* (citing *In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997)).

The Board erred by disregarding this canon of claim construction. (A175-76, Institution Decision; A28-32, Rehearing Decision.) The Board arrived at this view based on the misguided notion that the amendment has no legal consequence only because, it speculated, "the positions of the Examiner and the patent applicant changed following a telephone interview." (A30, Rehearing Decision.) Nothing supports the Board's inference that solely because the applicant and the examiner conducted a telephone interview that the examiner "changed" his mind about what

35

Samuels '851 teaches. *See* 37 C.F.R. 1.2 ("The action of the Patent and Trademark Office will be based exclusively on the written record in the Office."). At best the written record says nothing. But the absence of any support in the record for such a meeting of the minds compels the opposition conclusion. The examiner never withdrew the rejection and Dr. Samuels never retracted his amendment of claim 4.

The Board's reasoning that the unsummarized telephone interview somehow neutralized this clear and unmistakable acquiescence and amendment is legally incorrect. (A30-31, Rehearing Decision.) In a case involving whether the applicant successfully cured a misrepresentation during an examiner interview, this Court held that "in view of the fact that there is *no written evidence* of any disclosure that there had been previous misrepresentations, to say nothing of their specific correction, we hold that the asserted 'cure' was insufficient as a matter of law." *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1573 (Fed. Cir. 1983) (emphasis added). Where the record is devoid of any written documentation, no inferences can be made as to what the examiner relied upon or understood. *See Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1103 (Fed. Cir. 2003) (an ambiguous later action "could not negate that extensive public record.")

Indeed, it is commonly understood that "[w]hen the written record of a file history suggests that an amendment of a claim was made for purposes of avoiding prior art, an applicant may not contend that the written record is untrue based on

undocumented recollections of the oral statements that were made in an interview with the examiner. Thus, the applicant who fails to provide written documentation of an interview with the examiner that expresses the applicant's position that claim amendments were made for reasons other than overcoming prior art is estopped from contending that the amendments were not related to patentability." 2 ANNOTATED PATENT DIGEST § 14:89. *See also Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed. Cir. 1984) (explaining that failure to document the results of an interview with the examiner estopped the applicant from later contending that the "prosecution record is not true," and that submission of a perfunctory paper that did not document the interview with the examiner amounted to a failure to document the interview that estopped the applicant from relying on an alleged oral compromise regarding the rejection that could not overcome the written record indicating there was an acquiescence to the rejection).

The public is entitled to rely on that affirmative and unequivocal act by the patentee, and the Board erred as a matter of law in holding otherwise. The Board's construction should be reversed and TriVascular's proposed construction should be adopted; namely that a "circumferential ridge" means an elevated part of the outer surface disposed about the inflatable cuff, which can be either continuous or discontinuous. (*See, e.g.*, A67-70, Petition, A354, Petitioner's Reply.)

### C.     This affected the Board's obviousness analysis by requiring the skilled artisan to modify Samuels '851 to have "raised strips."

The Board's claim construction error is not harmless. Because Dr. Samuels only proposed his narrowing construction of "inflatable protrusion" after the Board construed the other claims and instituted trial, TriVascular was forced to pursue two theories of unpatentability based on Samuels '851 and Todd. First, that Todd teaches inflatable protrusions under the broadest reasonable interpretation. (A348-56, Petitioner's Reply; A434-40, Hearing Tr., 6:3-12:6.) And, second, even under Dr. Samuels' narrow interpretation, Samuels '851 teaches inflatable protrusions. (A356-57, 359-61, Petitioner's Reply; A440-45, Hearing Tr., 12:7-17:15.) Under the second theory, it would have been obvious to consider replacing *just the barbs* of Samuels '851 with the gripping protuberances of Todd to come up with the claimed stent. In addition to Todd, various non-penetrating fixation approaches were well-known alternatives to penetrating barbs, and a skilled artisan would have had a reasonable expectation of success with those approaches. (*See, e.g.*, A565, Lane, 5:17-31; A622-23, Holman, 2:58-3:45; A532, Lazarus, 5:32-40, A536, *id.*, 14:21-31.)  TriVascular argued both theories. (A341-62, Petitioner's Reply.)

The Board rejected TriVascular's second theory based on its erroneous construction of "circumferential ridges," apparently struggling to imagine how the inflatable recesses of Samuels '851 could be fitted with gripping protuberances and disposed about the cuff to form a "circumferential ridge." (*See, e.g.*, A175-76, 189,

Institution Decision; A444-45, Hearing Tr., 16:11-17:15; A5-6, 18-20, Final

Decision; A30-32, Decision on Rehearing) The Board augured its skepticism

during the oral hearing, and declined to revisit its construction in the final decision.

(A5-6, Final Decision.) The Board's final decision asserts that it did so because

"because neither party has contested it, and we discern no evidence in the full

record compelling a different interpretation." (*Id.*) But this is untrue. The trial

record shows that TriVascular emphasized and re-emphasized the prosecution

history and its importance in assessing the prior art, advocating that the Board's

construction—"a raised strip (as of plowed ground)"—must include inflatable

protrusions that can form discontinuous circumferential ridges. (*See, e.g.*, A64-65,

67-70, Petition; A352-361, Petitioner's Reply; A473-74, Hearing Tr., 45:16-46:17;

A488-97, Request for Rehearing; A504-505.) The Board may have ignored these

arguments and maintained its construction, but TriVascular did not waive them.

Nor did the Board actually allege "waiver." (A30, Rehearing Decision.)

Accordingly, the Court should feel at liberty to decide the merits of this

claim construction dispute based on the record before it. That record shows that

TriVascular maintained its position from the petition to the present and that, under

that construction, Samuels '851 and Todd render the challenged claims obvious.

**III.    The Board erred in determining that the skilled artisan would not have combined the teachings of Samuels '851 and Todd because it misapplied *KSR*, contradicted itself, and made a decision unsupported by evidence.**

The rationale for replacing *just the barbs* of Samuels '851 with Todd's rigid gripping protuberances is what the Board originally grasped: that there are a finite number of identified, predictable solutions and design choices for achieving vessel fixation for a stent (A182-83, Institution Decision)—e.g., inflatable protrusions (A510, Samuels '851, Abstract; A517, Rogers, Abstract; A536, Lazarus, 14:21-31), bumps, nubs, ridges, textures, and combinations thereof (A565, Lane, 5:17-31; A587-88, Todd, 6:58-7:53, A592, *id.*, 15:1-26; A622-23, Holman, 2:58-3:45; A532, Lazarus, 5:31-40, A536, *id.*, 14:21-31), or penetrating barbs. (A47, '575 patent, 1:53-59; A514, Samuels '851, 1:48-57.) Given the state of the art during the relevant timeframe, the skilled artisan would have had a reasonable expectation of success in using a rigid gripping protuberance in place of a barb to come up with a non-penetrating friction enhancing surface. (A181-83, Institution Decision.) And the skilled artisan would have had good reason to pursue the known options within his or her technical grasp—e.g., to solve the well-characterized problem of affixing the stent without penetrating the vessel wall—given the known benefits flowing from that decision. (A71-115, Petition.) (*See also* A530, Lazarus, 1:52-64; A552, Rhodes, 2:29-39, 2:55-61; A569, Miller Jr., 1:31-56, A571, *id.*, 6:6-10; A585, Todd, 2:35-43, A586 -7, *id.*, 4:61-5:6, A591, *id.*, 14:9-24; A575, Todd, Abstract,

A587-88, *id.*, 6:58-7:53; A510, Samuels '851, Abstract; A607, Pigott, 1:57-68.)

As the Board recognized, the stent art is predicable. (A182-83, Institution Decision.) Moreover, it is crowded, such that multiple prior art references teach the same or similar concepts. (A192, *id.*) Consequently, the design choices would have been limited and straight-forward. Moreover, the objective of effectively anchoring a stent without inflicting damage to a vessel wall was similarly well-characterized, as shown above. Substituting these well-known elements would predictably result in a stent that meets every limitation of Dr. Samuels' claims. And, the articulated rationale that it would have been obvious to replace the barbs of Samuels '851 with Todd's protuberances because "the protuberances and the barbs are each friction-enhancing features used for attachment to a vessel" is legally sufficient. (A182, *id.*)

Having found the requisite rationale, and a sufficient articulation thereof, to support the combination of teachings based on the evidence already of record, the Board erred in making a final determination inconsistent with that finding. It did so without explanation and without evidence supporting its decision. Dr. Samuels argued teaching away, but the Board disagreed. Nor did the Board find that the questionable testimony submitted by Dr. Samuels himself, or that of Dr. Clark, negated the *prima facie* showing of a reasonable expectation of success made out in the petition. The Board's change of heart is thus unjustified and unsupported.

41

And the Board went further astray when it required TriVascular to set forth a detailed schematic, or supply an exact technical explanation, as to how the skilled artisan would physically make the proposed combination. No such explanation is required under this Court's precedent. The standard for combining prior art, as articulated by the Supreme Court, is flexible and permits ordinary creativity—particularly in cases involving the straight-forward substitution of known elements.

Dr. Samuels proclaims in his declaration that the combination of these admittedly known elements was "a crucial advancement in the art." (A2112, Samuels Decl.) But this rings hollow in view of the catalogue of prior art employing indistinguishably similar methods to achieve the same objective.

TriVascular articulated a sufficient rationale for combining Samuels '851 and Todd, as the Board at first recognized. Having made that prior finding, the Board erred by ignoring it without adequate reasoning or evidence to support its change of opinion. The Board doubly erred by requiring that TriVascular show how Samuels '851 and Todd could be bodily incorporated into one another.

Accordingly, the Board's final determination should be reversed and the claims found unpatentable based on the combination of Samuels '851 and Todd.

### A. The rationale to combine Samuels '851 and Todd is to obtain the predictable and desirable result of non-penetrating stent fixation.

A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have

been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). *See generally Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

It is rational to combine references where "there are a finite number of identified, predictable solutions, [and] a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007). In its obviousness analysis, the Board can "take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. And, "[o]bviousness does not require absolute predictability." *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).

In this same vein, courts "do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." *In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007). Indeed, this Court has stated, consistent with the letter and spirit of *KSR*, that "while an analysis of obviousness always depends on evidence that supports the required *Graham* factual findings, it also may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *Perfect Web Techs., Inc., v. Infosua, Inc.*, 587 F.3d 1324, 1329-30 (Fed. Cir. 2009). "Nor are expert opinions always a prerequisite, for '[i]n many patent cases expert testimony will not be necessary because the technology will be

easily understandable without the need for expert explanatory testimony.'" *Id.* at 1329 ) (internal citations omitted) .

Dr. Samuels' own expert, Dr. Clark, admitted during cross-examination that Samuels '851 discloses "inflatable protrusions" that are themselves inflatable. For example, in considering Figures 3 and 4 of Samuels '851, Dr. Clark stated that: "The protrusions that I'm referring to are numbered 18 in figure four . . . [T]he recess is the inflatable protrusion that delivers the barb to the wall of the blood vessel." (A1625-26, Carter Dep. Tr. 130:23-131:5.) Dr. Clark also testified that:

> Q: When it's been fully inflated and the recesses are now protrusions on the outer surface of the cuff, aren't they – notwithstanding the barbs are – aren't they also inflatable protrusions?
>
> A. They are inflatable protrusions, but they're not significantly participating to the frictional engagement with the vessel wall that is being accomplished by the embedded barbs.

(A1626, *id.*, 131:6-14.)

> Q: Thank you. Looking at figures three and four of the 851 patent, if the barbs were removed from the structure and the lumen of the cuff were fully inflated, would portions of the – what were formerly the recesses and that are now inflatable protrusions contact, at least as much as shown in figure four, the lining of the blood vessel?

> A: They would at least partially contact the
> inner lining of the blood vessel.

(A1630, *id.*, 135:6-16.)

Thus, Samuels '851 teaches all the elements of the challenged claims except that Samuels '851 uses barbs to prevent the cuff from moving. And Todd teaches rigid "[g]ripping means for securely gripping the walls of a body passageway in order to secure [a] catheter in place within the passageway." (A586, Todd, 4:16-18.) Todd further describes the protuberances as "soft enough to grip the walls of the body passageway without damaging the issues." (A587, *id.*, 6:66-68.) Todd explains that "various configurations of protuberances will accomplish the teachings of the present invention." (A587, *id.*, 6:60-66.) And the prior art invites the skilled artisan to substitute configurations as necessary to obtain the desired effect, as the skilled artisan would have recognized. (*See, e.g.*, *id.*; A515, Samuels '851, 4:21-37; A523, Rogers, 3:40-42, 4:18-21; A531, Lazarus, 4:12-26, A539, 19:5-17; A555, Rhodes, 8:12-27; A597, Sisson, 3:26-35; A624, Holman, 5:43-57.)

The Board initially agreed that it would have been obvious to replace the barbs of Samuels '851 with Todd's protuberances to achieve the "predictable result" of non-penetrating fixation, because both are "friction-enhancing features used for attachment to a vessel." (A182-83, Institution Decision.) And, for the very same reason, it would have been obvious to replace *just the barbs* of Samuels '851 with Todd's gripping protuberances. Thus, the original rationale for combining

45

Samuels '851 and Todd was legally sufficient and should have been maintained.

### B. The Board did not find that the references teach away or that there would have been no reasonable expectation of success.

Dr. Samuels did not prove teaching away, nor did he disprove reasonable expectation of success. (A141, 145, Preliminary Response; A183-84, Institution Decision; A254-61, A264-66, Patent Owner Response; A18-19, Final Written Decision.) As the Board recognized, the legal standard for teaching away is whether "a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). Moreover, a given course of action often has simultaneous advantages and disadvantages, but that does not negate a reason to combine the references. *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000) ("The fact that the motivating benefit comes at the expense of another benefit . . . should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another.") Dr. Samuels' attempt to make this showing before the Board failed because neither the law nor the facts support his contention. The Board agreed. (A183, Institution Decision.)

The mere fact that Samuels '851 discusses using barbs does not foreclose replacing the barbs with gripping protuberances. *See generally In re Mouttet*, 686

F.3d 1322, 1334 (Fed. Cir. 2012) (holding no teaching away where nothing in the art foreclosed implementing the combination in the manner suggested) (citing *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998) (finding no teaching away where nothing in the prior art device suggested that the claimed invention was unlikely to work)). Dr. Samuels has not, and cannot, demonstrate that the combination of Samuels '851 and Todd in the manner proposed creates an "inoperative or nonfunctional" solution, one by which the stated goal of the '575 patent cannot be accomplished. *Syntex (U.S.A) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("Under the proper legal standard, a reference will teach away when it suggests that the developments flowing from its disclosures are unlikely to produce the *objective of the applicant's invention*.") (emphasis added).

Notably, the Board did not rely on Dr. Samuels' self-serving declaratory testimony, or that of Dr. Carter, when it inexplicably rejected the suggestion of replacing just the barbs of Samuels '851 with Todd's gripping protuberances. (A18-19, Final Decision.) Nor should the Board have relied on these declarations. For example, Dr. Samuels asserts in his declaration that "the removal of the barbs from the arrangement in Samuels '857 [sic] will certainly, substantially increase the tendency for potential migration of the device to an undesired location." (A265, Patent Owner Response.) But neither declaration supports this assertion. Rather, Dr. Samuels' declaration states only that the "barbs disclosed in [Samuels] '851

were advantageous in this regard, as opposed to just friction engagement which would certainly be more prone to migration issues." (A2111, Samuels Decl.) Dr. Samuels' declaration does *not* state that the removal of the barbs would necessarily cause migration issues. Nor does Dr. Clark's declaration provide support for Dr. Samuels' argument. Dr. Clark states only that "[w]ith respect to removing the barbs in Samuels '851, the barbs are designed to fixedly secure the medical device in place and, in my opinion, removal of the barbs could result in the increased potential for undesirable migration of the graft." (A2134, Clark Decl.) But Dr. Clark does *not* state that removing the barbs would necessarily cause migration.

The Board correctly declined to find teaching away, or even that the combination could not be made without destroying the purpose of Samuels '851. (A183, Institution Decision; A18-19, Final Decision.) But the Board did not explain why its previously articulated rationale no longer applied. As such, the Board's final determination to reject the combination is unsupported by evidence. Once TriVascular made out a *prima facie* case of obviousness, the Board should have sustained its finding unless the record compelled a different conclusion. It did not, and the Board's inconsistent determination should be reversed.

### C.    The Board improperly required bodily incorporation of the references, and ignored the state of the art and its predictability.

The Board erred by ignoring the state of the art. The teachings of, among others, Lazarus, Rogers, and Holman, demonstrate that inflatable protrusions and

gripping protuberances were well-known elements in the prior art, and the problem of combining them in various ways to achieve non-penetrating stent fixation was well-characterized. The Board applied the wrong test for whether the teachings of Samuels '851 and Todd may be combined and ignored this evidence. Considering the prior art of record as proof of the state of the art, it would have been obvious to substitute the rigid gripping protrusions of Todd for *just the barbs* of Samuels '851 to arrive at the predictable result of a non-penetrating friction enhancing surface.

It is hornbook law that "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference . . . . Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981). *See also In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements.") (citing *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole."); *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically

combinable to render obvious the invention under review."); *In re Nievelt*, 482

F.2d 965, 968 (C.C.P.A. 1973) ("Combining the teachings of references does not

involve an ability to combine their specific structures.").

This Court has consistently applied this reasoning over time, as recently as

this year. *See, e.g.*, *In re Chuang*, 2015 WL 526030, at *4 (Fed. Cir. Feb. 10, 2015)

(explaining that just because two references teach different payment models does

not mean the skilled artisan would have been discouraged from combining

different features from the two disclosures, including the well-known aspect of

using expiration dates on rental media because it is not necessary that the

inventions of the references be physically combinable to render obvious the

invention under review). The Board overlooked this important body of law.

TriVascular showed that Samuels '851 teaches inflatable protrusions and

that, for the same reasons the Board previously accepted, it would have been

obvious to replace *just the barbs* with Todd's rigid gripping protrusions to come up

with a non-penetrating friction enhancing surface. (*See, e.g.*, A81-115, Petition;

A358-61, Petitioner's Reply; A440, Hearing Tr. 12:7-20, A440-41, *id.*, 12:21-

13:21; A488-502, Request for Rehearing.) Prior art from the relevant time-frame

supports the combinability of Samuels '851 with Todd, *regardless* of whether

Todd's protrusions are "themselves" inflatable. This is because, consistent with the

evidence, it would have been obvious to take the inflatable protrusions of Samuels

'851 and bond a rigid gripping protuberance to its surface, in place of the barb—a simple substitution of known elements. (A182-83, Institution Decision.) (*See also* A565, Lane, 5:17-31; A587-88, Todd, 6:58-7:53, A592, *id.*, 15:1-26; A622-23, Holman, 2:58-3:45; A532, Lazarus, 5:32-40, A536, *id.*, 14:21-31.) When the modified protrusion of Samuels '851 is inflated, it would deliver the rigid gripping protuberance to the wall of the vessel, where it would serve its ordinary and well-known purpose of affixing the stent without penetrating the vessel wall. (*Id.*)

The presence of a "rigid component" on the inflatable protrusion makes no difference. First, Dr. Samuels' own expert, Dr. Clark, agreed that Samuels '851 teaches inflatable protrusions even though it includes a solid barb. (A1625-26, Carter Dep. Tr. 130:23-131:14.) Second, Dr. Samuels is estopped from arguing that the addition of a rigid component to the surface of the inflatable protrusion disclosed in Samuels '851—whether the rigid component is a barb or a gripping protuberance—renders the protrusion non-inflatable. Dr. Samuels abandoned that distinction during prosecution when he attempted to distinguish his claims from Samuels '851 on this basis through amendment. (A1122-23, Amendment B; *supra* Part II.B) (discussing prosecution history.) (*See also* A67-70, Petition; A352-357, Petitioner's Reply; A334-36, Petitioner's Opposition to Motion to Amend.)

During the oral hearing, however, the Board questioned, with apparent skepticism, what the combination of Samuels '851 and Todd would actually look

like if one were to replace *just the barbs* of Samuels '851 with Todd's gripping protuberances. Counsel for TriVascular explained that "if, for example, we didn't bond the barbs to the '851 device and we fully inflated it, we would have inflatable protrusions that protrude above the surface of the inflatable cuff engaging the vessel . . . . So, we would just substitute Todd for the barbs." (A444, Hearing Tr. 16:11-18. ) The Board inquired further whether the "circumferential ridge is running through the recesses?" or if the skilled artisan would "eliminate the recesses, eliminate the barbs, and just have a circumferential ridge around the surface." (A444, *id.*, 16:19-20, 16:23-24.) After attempting to further clarify its explanation, counsel for TriVascular concluded by explaining to the Board that: "[T]he simplest way of looking at it and what was done is instead of incorporating the recesses and inflatable recesses that became inflatable protrusions, one would substitute around, circumferentially around the cuff, the inflatable cuff, a circumferential ridge, similar to the one that is in Todd." (A445, *id.*, 17:10-15.)

Apparently unsatisfied with this explanation, the Board ultimately rejected the theory in its final written decision, reasoning: "At oral argument, TriVascular was unable to explain why anyone would use the recesses of Samuels '851 in the proposed combination of Samuels '851 and Todd." (A19, Final Decision.) Such reasoning reveals that the Board sought a perfect and comprehensive technical articulation of how the proposed combination would operate in practice—in effect

requiring bodily incorporation of Todd into Samuels '851 in the manner suggested. (*Compare* A18-19, Final Decision; *with* A182-184, Institution Decision.) Such an explanation, while conceivable, is not required under *KSR*. Nor is it a valid basis to reject an otherwise unrebutted and sufficient *prima facie* case of obviousness.

The Board's charge that TriVascular's theory relying on Samuels '851 for inflatable protrusions was "not laid out in the petition" is similarly in error. (*See, e.g.*, A81-115, Petition; A358-61, Petitioner's Reply; A440, Hearing Tr. 12:7-20, A440-41, *id.*, 12:21-13:21; A488-502, Request for Rehearing.) And the Board did not actually find waiver. (*See* A30, Decision on Rehearing.) In any event, the theory underlying the combination is not waived. Accordingly, the Board violated the well-settled legal principle that obviousness does not require an actual, physical substitution of elements or bodily incorporation. *In re Mouttet*, 686 F.3d at 1332.

Regardless, the answer to the Board's question is that, based on the state of the art, the skilled artisan would have known that barbs and gripping protuberances serve the same purpose: affixing the stent. (A182-84, Institution Decision.) The skilled artisan would have known that the two elements could be substituted with a reasonable expectation of success in securing the stent in place. (*Id.*) With the well-characterized objective of producing a non-penetrating friction enhancing surface, the skilled artisan would have replaced just the barbs of Samuels '851 with Todd's gripping protuberances to arrive at the claimed subject matter. (A565, Lane, 5:17-

31; A587-88, Todd, 6:58-7:53, A592, *id.*, 15:1-26; A622-23, Holman, 2:58-3:45;

A532, Lazarus, 5:32-40, A536, *id.*, 14:21-31.) The stent art is predictable and the

known elements used for stent fixation could be readily substituted, as prior art of

record amply demonstrates. (A587, Todd, 6:60-66; A515, Samuels '851, 4:21-37;

A523, Rogers, 3:40-42, 4:18-21; A531, Lazarus, 4:12-26, A539, 19:5-17; A555,

Rhodes, 8:12-27; A597, Sisson, 3:26-35; A624, Holman, 5:43-57.)

Instead of requiring counsel to explain how Todd's ridges could be bodily

incorporated into Samuels '851, the Board should have observed the state of the

art, based on the prior art of record, and concluded that the skilled artisan would

have had at her disposal a finite number of known, substitutable elements. The

Board correctly arrived at that conclusion in instituting trial, but then changed its

opinion (without justification or contrary evidence) in its final decision. The Board

went astray by focusing narrowly on Todd and denying the skilled artisan ordinary

creativity. Because of this, the Board rejected TriVascular's theory that Samuels

'851 teaches inflatable protrusions—albeit those that are disposed discontinuously

about the cuff—and that its barbs could have been easily replaced with Todd's

gripping protrusions to arrive at the subject matter claimed in the '575 patent.

In *KSR*, the Supreme Court made clear that obviousness is not based solely

on the disclosures of individual references, but makes recourse to the knowledge,

creativity, and common sense that an ordinarily skilled artisan would have brought

to bear when considering combinations or modifications. *KSR*, 550 U.S. at 415–22.

This requires reading the prior art in context, taking into account demands known

to the design community, the background knowledge possessed by the  skilled

artisan, and "the inferences and creative steps that a person of ordinary skill in the

art would employ." *Id.* at 418. This "expansive and flexible approach," *id.* at 415,

means that obviousness "not only permits, but requires, consideration of common

knowledge and common sense." *DyStar Textilfarben GmbH & Co. Deutschland*

*KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006)(emphasis omitted).

In this case, the Board's obviousness analysis ran afoul of that basic mandate

by applying a "blinkered focus on individual documents"—narrowly assessing

obviousness based on the applied references and ignoring the record evidence cited

by TriVascular demonstrating the knowledge and perspective of one of ordinary

skill in the art. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

The prior art of record establishes that it would have been obvious to

substitute a gripping protuberance for a barb. The Board erred by ignoring this

evidence, contrary to the mandate of this Court and *KSR*. For example, the Board

expressly rejected reliance on Holman and Rogers as probative of whether the

skilled artisan would have combined Samuels '851 and Todd—dismissing them as

not part of trial, and failing to address their probative value as evidence of the state

of the art. (A32-34, Decision on Rehearing.) The Board's narrow focus on Samuels

'851 and Todd in isolation is contrary to this Court's post (as well as pre) *KSR* law. In doing so, the Board failed to account for critical background information that easily explains why the skilled artisan would have been motivated to combine or modify Samuels '851 in view of Todd to arrive at the claims of the '575 patent.

This was legal error. The knowledge of the skilled artisan is part of "the store of public knowledge that must be consulted when considering whether a claimed invention would have been obvious." *Randall*, 733 F.3d at 1362. This Court has repeatedly recognized the role of common knowledge and common sense as a factual foundation for what one of ordinary skill in the relevant art would have known. *See Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012); *Perfect Web*, 587 F.3d at 1328. One form of evidence used to provide such a foundation, "perhaps the most reliable because not litigation-generated, is documentary evidence consisting of prior art in the area." *Randall*, 733 F.3d at 1363. The prior art is part of the proceeding, and TriVascular cited various patents that disclose surface features applied to stents, both inflatable and non-inflatable, used to enhance friction and prevent migration. (A79-80, A114-115, Petition.)

The significance of that prior art is not that it forms a distinct ground of unpatentability for trial; rather, it is important *evidence* of the state of the art and the context in which the applied combination should be evaluated. *See Randall*, 733 F.3d at 1362-63. As such, the Board was required to consider it.

The Board's failure to consider that evidence was plainly prejudicial. Once it had been established that using gripping protuberances was a well-known method of achieving stent fixation, it should have been self-evident that the skilled artisan could have considered modifying Samuels '851 to include this feature—because doing so would allow the skilled artisan to achieve the advantages of non-penetrating stent fixation using a design element that was familiar to the industry.

Although Samuels '851 uses a barb, there is no dispute that it would have been well within the capabilities of an ordinary stent designer to replace a barb with a rigid gripping protuberance so that the inflatable protrusions of Samuels '851 could provide a non-penetrating friction enhancing outer surface. There are no proven, or alleged, functional concerns that would have discouraged the skilled artisan from replacing barbs with gripping protrusions to achieve stent fixation.

Thus, when viewed in the context of the background TriVascular provided, the evidence strongly supports the notion that the stent design claimed by Dr. Samuels was nothing more than the "combination of familiar elements according to known methods," "'each performing the same function it had been known to perform'," "yield[ing] predictable results." *KSR*, 550 U.S. at 416. Neither Dr. Samuels nor the Board pointed to any objective indicia of non-obviousness. In view of this evidence, and the Board's insufficient reasoning, its rejection of the combination of Samuels '851 and Todd is tainted by this prejudicial error.

In sum, the combination of Samuels '851 and Todd renders the claims of the '575 patent unpatentable. No further fact finding is required, and this Court should find the claims unpatentable. Alternatively, this Court should remand this case to Board to consider the prior art of record under the correct claim construction.

## CONCLUSION

The Board erred in requiring that "circumferential ridges" be continuous. Properly construed, under the broadest reasonable interpretation and in light of the prosecution history, the claimed ridges can be discontinuous. The Board also erred in determining that the skilled artisan would not have combined the teachings of Samuels '851 and Todd to arrive at the claimed invention. The Board misapplied *KSR*, contradicted itself, and made a decision that is unsupported by substantial evidence. In sum, the Board erred in concluding that the challenged claims are not unpatentable over the combination of Samuels '851 and Todd. No further fact findings are necessary, and its decision should be reversed. Alternatively, this case should be remanded to consider the prior art under the correct construction.

Dated: July 6, 2015

Respectfully submitted,

/s/ David K.S. Cornwell

David K.S. Cornwell
Richard D. Coller III
Pauline M. Pelletier
STERNE, KESSLER, GOLDSTEIN & FOX, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8580

*Counsel for Appellant Trivascular, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing **BRIEF OF APPELLANT**:

1.    Complies with the type-volume limitation FED. R. APP. P. 32(a)(7)(B). This brief contains **12,692 words**, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b). Microsoft Word 2010 was used to calculate the word count.

2.    Complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Time New Roman type style.

/s/ David K.S. Cornwell
David K.S. Cornwell
*Counsel for TriVascular, Inc.*

Dated: July 6, 2015

Form 30

**FORM 30. Certificate of Service**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Jul 6, 2015 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| David K.S. Cornwell | | /s/ David K.S. Cornwell |
| Name of Counsel | | Signature of Counsel |

Law Firm | Sterne, Kessler, Goldstein & Fox, P.L.L.C. |

Address | 1100 New York Avenue, NW, Suite 600 |

City, State, ZIP | Washington, DC 20005 |

Telephone Number | (202) 772-8580 |

FAX Number | (202) 371-2540 |

E-mail Address | DAVIDC@skgf.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

# ADDENDUM

# Prosecution History for IPR2013-00493

| Filing Date | Document |
|---|---|
| 08/05/2013 | Petition for *Inter Partes* Review |
| 08/05/2013 | Petitioner's Power of Attorney |
| 08/12/2013 | Notice of Filing Date Accorded to Petition |
| 08/26/2013 | Patent Owner's Power of Attorney |
| 08/26/2013 | Patent Owner's Mandatory Notices |
| 11/08/2013 | Patent Owner's Preliminary Response |
| 02/04/2014 | Decision - Institute *Inter Partes* Review |
| 02/04/2014 | Scheduling Order |
| 02/10/2014 | Patent Owner's Exhibit List |
| 02/18/2014 | Patent Owner's Request for Rehearing |
| 02/19/2014 | Order - Conduct of the Proceedings § 42.5 |
| 02/24/2014 | Decision - Request for Rehearing |
| 03/05/2014 | Petitioner's Submission of Exhibit |
| 03/05/2014 | Petitioner's Exhibit List |
| 03/28/2014 | Order - Conduct of the Proceedings § 42.5 |
| 04/04/2014 | Patent Owner's Response to Petition |
| 04/04/2014 | Patent Owner's Exhibit List |
| 04/04/2014 | Patent Owner's Contingent Motion to Amend |
| 04/22/2014 | Petitioner's Submission of Exhibit |
| 04/22/2014 | Petitioner's Exhibit List |
| 05/07/2014 | Petitioner's Notice of Deposition |
| 05/07/2014 | Petitioner's Notice of Deposition |
| 06/04/2014 | Petitioner's Exhibit List |
| 06/04/2014 | Petitioner's Opposition to Motion to Amend |
| 06/04/2014 | Petitioner's Reply to Response to Petition |
| 07/03/2014 | Patent Owner's Reply to Opposition to Motion to Amend |
| 07/29/2014 | Petitioner's Request for Oral Argument |
| 07/29/2014 | Patent Owner's Request for Oral Argument |
| 07/31/2014 | Order - Trial Hearing Notice |
| 08/26/2014 | Petitioner's Notice of Submission of Demonstrative Exhibits |
| 08/26/2014 | Petitioner's Exhibit List |
| 08/26/2014 | Patent Owner's Notice of Submission of Demonstrative Exhibits |
| 08/26/2014 | Patent Owner's Exhibit List |
| 08/29/2014 | Patent Owner's Notice of Designation of Additional Back-Up Counsel |

| Filing Date | Document |
|-------------|----------|
| 08/29/2014 | Patent Owner's Power of Attorney |
| 09/02/2014 | Order - Conduct of the Proceedings § 42.5 |
| 09/02/2014 | Patent Owner's Notice of Submission of Demonstrative Exhibit |
| 09/02/2014 | Patent Owner's Exhibit List |
| 09/16/2014 | Petitioner's Submission of Exhibit |
| 09/16/2014 | Petitioner's Exhibit List |
| 09/30/2014 | Oral Hearing Transcript |
| 12/03/2014 | Final Written Decision |
| 12/31/2014 | Petitioner's Request for Rehearing |
| 01/29/2015 | Decision - Request for Rehearing |

Trials@uspto.gov                                                    Paper 45
Tel: 571-272-7822                                    Entered: December 3, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

TRIVASCULAR, INC.,
Petitioner,

v.

SHAUN L.W. SAMUELS,
Patent Owner.

————————————

Case IPR2013-00493
Patent 6,007,575

————————————

Before TONI R. SCHEINER, RICHARD E. RICE, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*


RICE, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73(b)*

IPR2013-00493
Patent 6,007,575

# I. INTRODUCTION

## A. *Background*

Petitioner TriVascular, Inc. ("TriVascular") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–24 of U.S. Patent No. 6,007,575 (Ex. 1001, "the '575 Patent"). We instituted trial for claims 1, 2, and 4–24: claims 1, 2, 6–15, and 18–24 as obvious over Samuels '851[1] and Todd;[2] and claims 1, 4–6, 9–11, 13, 14, 16, 17, and 19–21 as obvious over Lazarus[3] and Todd. Decision to Institute (Paper 10, "Dec.") 26.

Patent Owner Shaun L.W. Samuels ("Dr. Samuels") filed a Request for Rehearing (Paper 13, "Req. Reh'g"). We denied the Request. Decision on Request for Rehearing (Paper 15).

Dr. Samuels filed a Patent Owner Response (Paper 19, "Resp.") and a contingent Motion to Amend (Paper 21). TriVascular filed a Reply (Paper 28, "Reply") and an Opposition to the Motion to Amend (Paper 27). Dr. Samuels filed a Reply to the Opposition (Paper 29).

In his Response (Paper 19), Dr. Samuels relied upon his own declaration (Ex. 2002) and the declaration of Timothy W.I. Clark, M.D. (Ex. 2003). In its Reply (Paper 28), TriVascular relied upon deposition testimony of Dr. Samuels (Ex. 1020) and Dr. Clark (Ex. 1021).

---

[1] US 5,423,851 (Ex. 1002).

[2] US 5,423,745 (Ex. 1008).

[3] US 5,693,088 (Ex. 1004).

2

Oral argument was conducted on September 3, 2014. A transcript is entered as Paper 44 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

TriVascular has not proved that claims 1, 2, and 4–24 are unpatentable.

We dismiss as moot Dr. Samuels's Motion to Amend.

*B. The '575 Patent*

The '575 Patent relates to an inflatable intraluminal stent that can be affixed to the interior surface of a tubular structure within the human body as a means of treating conditions such as stenosis. Ex. 1001, 2:28–31. The device features an inflatable cuff with a "friction-enhancing" outer surface. *Id.* at 2:35–36. Figure 1 of the '575 Patent is reproduced below:



Figure 1 is a perspective view of "an embodiment of the inflatable intraluminal stent of the present invention." *Id.* at 2:62–63, 3:24–25. As illustrated in Figure 1, stent 5 includes lumen 15, which is defined by inflatable cuff 17 having inner surface 19 and outer surface 23. *Id.* at 3:26–

3

IPR2013-00493
Patent 6,007,575

31. Outer surface 23 includes "a number of inflatable ridges 25 disposed about its circumference." *Id.* at 3:32–33.

Claim 1 is illustrative of the claimed subject matter and is reproduced below.

> 1. An inflatable intraluminal stent adapted to be secured to the interior of a tubular structure within the human body comprising:
>
> a) an inflatable and deflatable cuff of generally hollow cylindrical continuation having a collapsible lumen, an inner surface, an inlet, an outlet and a friction enhancing outer surface, said friction-enhancing outer surface featuring inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff, said friction-enhancing outer surface engaging the interior of the tubular structure without penetration to prevent the cuff from moving in a longitudinal direction with respect to the tubular structure when said cuff is in a fully inflated condition;
>
> b) means for injecting an inflation material into said cuff to inflate it; and
>
> c) a valve integral with the inflatable cuff for permitting entry of the inflation material from the means for injecting and thereafter sealing said cuff to prevent deflation.

*Id.* at 6:47–67.

4

IPR2013-00493
Patent 6,007,575

## II. DISCUSSION

### A. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

#### 1. *"Friction-enhancing outer surface"*

We determined, for purposes of instituting *inter partes* review, that the broadest reasonable interpretation consistent with the Specification of a "friction-enhancing outer surface" is an outer surface with features that increase its capability to engage or grip another surface. Dec. 8 (citing Ex. 1001, 2:35–37, 3:64–67). We maintain this interpretation because neither party has contested it, and we discern no evidence in the full record compelling a different interpretation.

#### 2. *"Circumferential ridge disposed about the inflatable cuff"*

We determined, for purposes of instituting *inter partes* review, that the broadest reasonable interpretation consistent with the Specification of a "circumferential ridge disposed about the inflatable cuff" is a raised strip

5

IPR2013-00493
Patent 6,007,575

disposed circumferentially about the outer surface of the inflatable cuff.
*Id.* at 9 (citing Ex. 1001, 3:32–33, 54, Figs. 1, 2; Ex. 1014 (WEBSTER'S
NINTH NEW COLLEGIATE DICTIONARY (1986)), 1014 ("ridge")).  We
maintain this interpretation because neither party has contested it, and we
discern no evidence in the full record compelling a different interpretation.

### 3.  "Means for" terms

Petitioner proposes claim constructions for each of the following
"means for" terms, which Petitioner contends are means-plus-function
limitations governed by 35 U.S.C. § 112 ¶ 6: "means for injecting an
inflation material into said cuff to inflate it," recited in claim 1; "means for
inflating the cuff with inflation material in fluid communication with said
inflation port," recited in claim 14; "means for inflating the plurality of cuffs
with inflation material," recited in claim 23; and "means for securing an
intraluminal medical device to the inner surfaces of the cuffs," recited in
claim 24.[4]  Pet. 7–9.  Dr. Samuels does not contest the applicability of § 112
¶ 6 to these limitations, and does not contest the proposed constructions.  We
determine that express construction of these limitations is not required for
this decision.

### 4.  "When said cuff is in a fully inflated condition" and "when the cuff is fully inflated"

Petitioner argues that the claim terms "when said cuff is in a *fully
inflated* condition," in claim 1 (emphasis added), and "when the cuff is *fully*

---

[4] We note that claim 20 recites similarly "means for securing an intraluminal
medical device to the inner surface of the cuff."

6

IPR2013-00493
Patent 6,007,575

*inflated,*" in claim 14 (emphasis added), each mean "when the cuff is inflated to the extent that the cuff is affixed to the lumen of the tubular structure but not inflated to the extent that it penetrates the tubular structure." Pet. 11 (emphasis added). We determine that express construction of these claim terms is not required for this decision.

### 5.  *"Inflatable protrusions"*

Each of the independent claims recites "said friction-enhancing outer surface featuring *inflatable protrusion(s)* including at least one circumferential ridge disposed about the inflatable cuff" (emphasis added). Petitioner did not propose a claim construction for "inflatable protrusions" in the Petition.

Dr. Samuels contends that "inflatable protrusions" are protrusions that contain fluid and are themselves inflatable. Resp. 5–8. In support of that claim construction, Dr. Samuels argues that ridges 25, as described in the Specification, are protrusions that "are themselves in fluid communication with the inflatable chamber 27 of cuff 17." *Id.* at 5–6 (citing Ex. 1001, 3:54–56, Fig. 2).

TriVascular argues that "inflatable protrusions can be 'solid' structures such as barbs or[,] in the case of [] some of the prior art examples, solid circumferential ridges." Reply 10 (citing Clark. Dep., Ex. 1021, 135:6–16 (discussing Samuels '851 (Ex. 1002))). TriVascular's proposed claim construction, however, does not accord with the plain meaning of "inflatable" as used in the Specification, i.e., expandable by being filled with fluid. *See, e.g.*, Ex. 1001, Abstr. 3–4, 3:55 ("inflatable chamber"), 1:30 ("inflatable balloon"), 2:33, 38, 3:30 ("inflatable cuff"), 3:33–34 ("inflatable

7

ridges"). Under the plain meaning of "inflatable" as used in the Specification, solid ridges are not "inflatable," because they are not capable of being filled with fluid. *See* Resp. 5–8; *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989) (holding that the words of the claim must be given their plain meaning unless the plain meaning is inconsistent with the specification).

Further, under TriVascular's proposed claim construction, there is no meaningful difference between "protrusions" disposed on an inflatable cuff and "inflatable protrusions" disposed on an inflatable cuff. *See* Tr. 10:7–14. Trivascular's proposed claim construction, therefore, fails to give any meaning to "inflatable" in "inflatable protrusions," and by not giving effect to all words of the claim, runs afoul of a cardinal rule of claim construction. *See Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim," so that physical structures and characteristics described specifically in a claim are not rendered "merely superfluous.").

TriVascular relies on the prosecution history of the '575 Patent. *See* Reply 5–7. TriVascular views the prosecution history through the lens of its contention that Samuels '851,[5] which was applied as anticipatory prior art by the Examiner,[6] discloses "inflatable protrusions" in the form of solid barbs 18. *See id.* Based on the premise that the only "inflatable protrusions"

---

[5] We provide an overview of Samuels '851 in section II.B.1 *infra*.

[6] *See* Non-Final Act., mailed Nov. 16, 1998, Ex. 1012, 70–75.

8

disclosed in Samuels '851 are solid barbs, TriVascular argues that
Dr. Samuels, by not traversing the Examiner's rejection over Samuels '851
but instead amending the claims, acted inconsistently with his claim
construction in this proceeding.  Reply 6–7 (citing Am't, dated Mar. 16,
1999, Ex. 1012, 81–89).  TriVascular, however, has not persuaded us that
the premise of its argument is correct.  Indeed, the argument is inconsistent
with TriVascular's assertion in this proceeding, discussed below, that the
recesses of Samuels '851 (not just the solid barbs) constitute "inflatable
protrusions."  *See, e.g.*, Pet. 27 (Claim Chart I, element 1a-3), 40–41 (Claim
Chart II, element 1a-3, incorporating information from Chart I); Tr. 13:22–
15:6.

Finally, TriVascular contends that Dr. Samuels's proposed
construction of "inflatable protrusions" is inconsistent with dependent
claims 2 and 15, which incorporate the "inflatable protrusions" limitation of
claims 1 and 14, respectively, and recite additionally "wherein the friction
enhancing outer surface is a coarse surface."  Reply 7–9.  TriVascular relies
on the embodiment illustrated in Figure 3 of the '575 Patent, which has an
outer surface "made coarse by a combination of raised portions 31 and
lowered portions 33."  *Id.* at 8 (citing Ex. 1001, 3:60–67, Fig. 3).  In essence,
TriVascular argues that the coarse surface described in the Specification is
solid and, therefore, "inflatable protrusions" must encompass solid
protrusions in order for claims 2 and 15 to encompass the embodiment
illustrated in Figure 3.  *Id.* at 7–9.  TriVascular's analysis is unpersuasive
because it fails to explain how claims 1, 2, 14, and 15 would encompass the
embodiment illustrated in Figure 3, even if "inflatable protrusions" were

9

IPR2013-00493
Patent 6,007,575

construed to encompass solid protrusions.  For example, even under
TriVascular's proposed construction, the embodiment illustrated in Figure 3
would not satisfy the claim requirement for "at least one circumferential
ridge."  We are not persuaded of any inconsistency in the scope of claims 1,
2, 14, and 15 under Dr. Samuels's proposed claim construction.

Accordingly, applying the standard of broadest reasonable
interpretation consistent with the Specification, we determine that "inflatable
protrusions" are protrusions that are themselves inflatable, i.e., expandable
by being filled with fluid.

### B. Obviousness Analysis

To prevail in its challenges to the patentability of claims 1, 2, and 4–
24, TriVascular must prove a proposition of unpatentability by a
preponderance of the evidence.  *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).
A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between
the subject matter sought to be patented and the prior art are such that the
subject matter as a whole would have been obvious at the time the invention
was made to a person having ordinary skill in the art to which the subject
matter pertains.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).
A patent claim composed of several elements, however, is not proved
obvious merely by demonstrating that each of its elements was known,
independently, in the prior art.  *KSR*, 550 U.S. at 418.  In analyzing the
obviousness of a combination of prior art elements, it can be important to
identify a reason that would have prompted one of skill in the art to combine
the elements in the way the claimed invention does.  *Id.*  A precise teaching

IPR2013-00493
Patent 6,007,575

directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *Id.* Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

We analyze the instituted grounds of unpatentability in accordance with the above-stated principles.

### 1. Asserted Obviousness of Claims 1, 2, 6–15, and 18–24 over Samuels '851 and Todd

We instituted a review based on TriVascular's contention that the combination of Samuels '851 and Todd renders obvious claims 1, 2, 6–15, and 18–24 under 35 U.S.C. § 103(a). Upon consideration of the parties' arguments and evidence, we determine that TriVascular has not demonstrated that those claims would have been obvious over Samuels '851 and Todd, for the reasons explained below.

### a. Overview of Samuels '851

Samuels '851 discloses inflatable balloon cuff 10, which can be used to affix a medical device within a tubular structure of the body. Ex. 1002, 2:35–37. Figures 1 and 2 of Samuels '851, which are reproduced below, illustrate cuff 10 before and after inflation, respectively:

11

IPR2013-00493
Patent 6,007,575



*Id.*, Figs. 1 & 2.

Figures 1 and 2 are pre- and post-deployment perspective views of
cuff 10, respectively.

As illustrated in Figure 1, cuff 10 includes a plurality of reinforced
recesses 12, each of which is bonded to individual barb 18 such that, before
inflation, individual barbs 18 lie beneath outer surface 14 of cuff 10. *Id.* at
2:40–42, 59–61. "When the cuff 10 is fully inflated," as illustrated in

12

IPR2013-00493
Patent 6,007,575

Figure 2, "the recesses 12 pop out to allow the barbs 18 to engage the wall of a tubular structure within the body." *Id.* at 2:62–64.

### b. Overview of Todd

Todd is directed to balloon catheters that are "designed for secure placement and sealing within body passageways." Ex. 1008, 3:67–4:2. In a preferred embodiment, "[g]ripping means project[] from the outer surface of the balloon for securely gripping the walls of the body passageway to secure the catheter in place." *Id.* at 6:50–52. In this regard, Todd discloses:

> A seal within the body passageway is also formed. This important gripping aspect of the present invention may comprise at least one irregularity in the outer surface of the balloon.

*Id.* at 6:52–56. The gripping means disclosed in Todd comprise "a plurality of protuberances that project outwardly from the outer surface of balloon 26." *Id.* at 6:57–59. As defined expressly in Todd, "[t]he term 'protuberance' refers to a projection from the outer surface of a balloon that assists in the retention of that balloon in a body passageway of a patient." *Id.* at 6:62–65. "The protuberances are soft enough to grip the walls of the body passageway without damaging the tissues." *Id.* at 6:65–67. Figures 7 and 8 of Todd illustrate various configurations of protuberances. *Id.* at 6:6–7:2. Figure 7 is reproduced below.

13

IPR2013-00493
Patent 6,007,575



FIG. 7

*Id.*, Fig. 7.

Figure 7 is a perspective view of inflatable balloon 26 illustrating "protuberances in the form of an outwardly projecting spiral ridge 48 wound about the exterior surface of balloon 26." *Id.* at 7:35–37. "When inflated, the spiral ridge 48 contacts and tightly grips the walls of a body passageway in which it is inserted." *Id.* at 7:37–39.

Figure 8 is reproduced below.



FIG. 8

*Id.*, Fig. 8.

14

IPR2013-00493
Patent 6,007,575

Figure 8 is a perspective view of inflatable balloon 26 illustrating "protuberances . . . in the form of outwardly projecting annular rings 52 wound about the exterior surface of balloon 26." *Id.* at 7:41–43.

TriVascular contends that Todd discloses friction-enhancing, inflatable balloon protuberances, including "inflatable ridges." Pet. 22 (citing Ex. 1008, Figs. 5–9), 41 & 51 (claim chart) (quoting Ex. 1008, 7:35–39, citing Ex. 1008, Fig. 7). At oral argument, TriVascular clarified its analysis of Todd's disclosure, and asserted that the protuberances disclosed in Todd are hollow, and themselves inflatable. Tr. 6:5–12:20. TriVascular cited in support of its position the statement in column 7 of Todd that: "*When inflated, the spiral ridge 48* contacts and tightly grips the walls of a body passageway in which it is inserted." *Id.* at 6–7; Ex. 1008, 7:37–39 (emphasis added); *see* Pet. 40–41 (Claim Chart II, element 1a-3, quoting Ex. 1008, 7:35–39). TriVascular, however, has not provided a declaration, or any other evidence, to establish that a person of ordinary skill in the art would understand Todd to disclose protuberances that are hollow, and themselves inflatable.

Dr. Samuels does not agree that Todd discloses "inflatable protrusions." Resp. 12. Dr. Samuels asserts that "the region between the inner and outer surfaces of balloon 26 of Todd is solid . . . and any provided roughened surfaces or protuberances are also solid." *Id.* (citing Ex. 1008, Figs. 4 & 8; Ex. 2004).

On the record before us, TriVascular has failed to show that Todd discloses "inflatable protrusions," i.e., protrusions that are expandable by being filled with fluid. *See* section II.A.5 *supra*. The protuberances

15

disclosed in Todd project outwardly "from the outer surface" of inflatable balloon 26. *See* Ex. 1008, 6:58–59, 62–63. As such, the protuberances are disposed on the exterior surface of the inflatable balloon, and are not in fluid communication with the balloon's inner chamber 32. *See* Resp. 12; Ex. 1008, 7:15–16, Figs. 2, 4 & 5 (describing knobs 40 as solid structures on the outer surface of the balloon), 7:32–34, Fig. 6 (describing "cross-hatched pattern 44 projecting outwardly from the exterior surface of balloon 26"), 7:35–39, Fig. 7 (describing "outwardly projecting spiral ridge 48 wound about the exterior surface of balloon 26"), 7:40–46, Fig. 8 (describing "outwardly projecting annular rings 52 wound about the exterior surface of balloon 26"). Todd discloses expansion means in fluid communication with inner chamber 32 for inflating balloon 26 (*id.* at 7:53–60), but does not disclose expansion means for inflating the protuberances, either separately or in conjunction with inflation of the balloon. Todd discloses, simply, that "when balloon 26 is inflated, the gripping means [i.e., the protuberances] on the exterior of the balloon contact and grip the walls of the body passageway." *Id.* at 8:14–16.

Trivascular has not persuaded us, moreover, that a person of ordinary skill in the art would have understood Todd's statement "[w]*hen inflated, the spiral ridge 48* contacts and tightly grips the walls of a body passageway in which it is inserted" (*id* at 7:37–39 (emphasis added)), to teach or suggest that spiral ridge 48 is expandable by being filled with fluid. *See* Tr. 6–7. Other than that isolated statement, there is no suggestion, indication, or hint in Todd that any of the disclosed protuberances is hollow such that it can be filled with fluid and inflated. To the contrary, as discussed above, Todd

16

discloses that all of the protuberances, including spiral ridge 48, are formed on the exterior surface of the balloon.  In light of that disclosure, a person of ordinary skill in the art would understand that spiral ridge 48 is not in fluid communication with the inner chamber of the balloon and, therefore, cannot be filled with fluid via the expansion means used to inflate the balloon.

TriVascular has failed to explain why, in the context of Todd's whole disclosure, the statement "[w]hen inflated, the spiral ridge 48 . . ." (Ex. 1008, 7:37–39) would not have been understood by a person of ordinary skill in the art as, simply, a specific example of the broader (and repeated) disclosure in Todd that "when balloon 26 is inflated, the gripping means on the exterior of the balloon contact and grip the walls of the body passageway" (*id.* at 8:14–16).  *See also id.* at 4:19–21 ("When the balloon is inflated, the gripping means come into contact with the walls of the body passageway."), 6:48–52 ("Once . . . the balloon is inflated, the catheter is held in place by gripping means projecting from the outer surface of the balloon for securely gripping the walls of the body passageway . . . .").

### c.  Analysis of Claims 1, 2, 6–15, and 18–24

TriVascular contends that it would have been "an obvious modification to take the friction-enhancing features of [Todd] and modify Samuels '851 while maintaining its basic intent and purpose."  Pet. 22. TriVascular asserts that a common purpose of the "inflatable protrusions and barbs" of Samuels '851 and the "ridges" of Todd is "to firmly secure the stent in one position in the lumen of the tubular structure."  Reply 12. Therefore, substitution of Todd's ridges for the barbs of Samuels '851,

17

IPR2013-00493
Patent 6,007,575

TriVascular argues, "would have been an obvious modification carried out with predictable success." *Id.*

Dr. Samuels counters that "no proper apparent reason has been presented by [Tri-Vascular] for the proposed combination." Resp. 14. Dr. Samuels also argues that Tri-Vascular "has not explained how the combination would have inflatable circumferential ridges," and that "Todd lacks any inflatable circumferential ridges." *Id.* at 16.

For the reasons discussed below, we determine that TriVascular has not shown that the combination of Samuels '851 and Todd satisfies the requirement of independent claims 1, 14, and 23 for "inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff."

In its Petition, TriVascular contends that recesses 12 of Samuels '851 satisfy the requirement of independent claims 1, 14, and 23 for "inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff." *See, e.g.*, Pet. 27 (Claim Chart I, element 1a-3), 40–41 (Claim Chart II, element 1a-3, incorporating information from Chart I); Tr. 13:22–15:6.  TriVascular has not explained sufficiently, however, why a person of ordinary skill in the art would have known to include the recesses of Samuels '851 in the proposed combination of Samuels '851 and Todd. As discussed above, recesses 12 of Samuels '851 function to project barbs 18 into surrounding tissue when inflatable balloon cuff 10 is filled fully with fluid.  *See* section II.B.1.a *supra*.  In its Reply, TriVascular asserts that the "inflatable protrusions and barbs" of Samuels '851 serve the same purpose as the "ridges" of Todd, but proposes, without elaboration, to

18

IPR2013-00493
Patent 6,007,575

substitute just the barbs of Samuels '851 with the ridges of Todd.  *See* Reply 12.  At oral argument, TriVascular was unable to explain why anyone would use the recesses of Samuels '851 in the proposed combination of Samuels '851 and Todd.  *See* Tr. 12:21–17:15.

We determine that Trivascular has not provided a sufficient rationale to support substituting the ridges of Todd for just the barbs of Samuels '851. *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.").

TriVascular also contends that it would have been obvious to eliminate *both* the recesses and barbs of Samuels '851, and to substitute "a circumferential ridge, similar to the one that is in Todd."  *See* Tr. 15:24– 17:15.  TriVascular asserts three reasons why combining the references in that fashion would satisfy the requirement for "inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff":  (1) the ridges are "inflatable" in the combination simply because they are riding on an inflatable cuff; (2) the ridges in Todd are themselves inflatable; and (3) use of ridges that are themselves inflatable would have been obvious, as they would take up less volume and be easier to insert in blood vessels than ridges that are not themselves inflatable.  *See id.* at 17:16–18:14.  None of those reasons is persuasive.  The first reason is not persuasive because it does not satisfy the requirement for "inflatable protrusions," i.e., protrusions that are expandable by being filled with fluid. *See* section II.A.5 *supra*.  The second reason is not persuasive because we do

19

IPR2013-00493
Patent 6,007,575

not agree that Todd discloses ridges that are themselves inflatable. *See* section II.B.1.b *supra*.

Lastly, the third reason is not persuasive because TriVascular has not established that a person of ordinary skill in the art would have known to use, on an inflatable cuff, circumferential ridges that are themselves inflatable. The evidence is to the contrary. *See, e*.g., Ex. 2002 (Samuels Decl.) ¶ 4.c ("No one else in the medical field, to the best of my knowledge, ever proposed or suggested an inflatable ridge-based sealing arrangement prior to my invention, ever."); Ex. 1020 (Samuels Dep.), 138:20–140:7 (affirming testimony in ¶ 4.c of Samuels Decl.), 187:11–14 (testifying that inflatable ridges were not known in the medical field); Ex. 2003 (Clark Decl.) ¶ 8 ("[B]eing able to reduce the overall diameter by just deflating the fluid chamber and, correspondingly, the ridges is an intriguing concept, one which was not known, to the best of my knowledge, in the medical field prior to Samuels '575."); Ex. 1021 (Clark Dep.), 82:19–21 ("I'm not aware of any inflatable protrusions to support an endograft prior to Samuels ['575].").

Upon consideration of the parties' arguments and evidence, we determine that Petitioner has not demonstrated that independent claims 1, 14, and 23, and their dependent claims 2, 6–13, 15, 18–22, and 24, are unpatentable for obviousness over Samuels '851 and Todd.

### 2. Asserted Obviousness of Claims 1, 4–6, 9–11, 13, 14, 16, 17, and 19–21 over Lazarus and Todd

We instituted a review based on TriVascular's contention that the combination of Lazarus and Todd renders obvious claims 1, 4–6, 9–11, 13,

20

IPR2013-00493
Patent 6,007,575

14, 16, 17, and 19–21 under 35 U.S.C. § 103(a).  Upon consideration of the
parties' arguments and evidence, we determine that TriVascular has not
demonstrated that those claims would have been obvious over Lazarus and
Todd, for the reasons explained below.

*a. Overview of Lazarus*

Lazarus relates to grafts that can be positioned intraluminally for
repair of vascular defects such as aneurysms.  Ex. 1004, 11–14.  Figures 3
and 4 of Lazarus are reproduced below:



Fig. 3

Fig. 4

21

IPR2013-00493
Patent 6,007,575

Figure 3 depicts intraluminal vascular graft 10, including attachment means 16 in the form of inflatable toroidal collars 50. *Id.* at 10:20–22, 15:15–18. Figure 4 is an enlarged view of a section of the inflatable collar illustrating inflation conduit 56 and closeable valve 58. *Id.* at 10:23, 15:15–18. Lazarus teaches that the intraluminal graft can be deployed within a vessel of the body to form a tight seal between the inflatable collar and the vessel wall, without use of potentially-damaging hooks or barbs. *Id.*, Abstr., 1:57–63, 15:24–28.

### b. Analysis of Claims 1, 4–6, 9–11, 13, 14, 16, 17, and 19–21

TriVascular relies upon Lazarus for all limitations of independent claims 1 and 14, except "inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff," for which TriVascular relies on Todd. Pet. 22–23, 40–41 (Claim Chart II, element 1a-3). As a reason to combine Lazarus and Todd, TriVascular asserts:

> A POSA looking to make an intraluminal device for treating aneurysms would look to Lazarus '088 and modify it with the teachings of [Todd] to arrive at the Samuels '575 recited claims. A review of the claim charts provides a clear blueprint for such obvious modification.

*Id.* at 23. TriVascular further asserts that "[i]t would have been an obvious modification to use [Todd's] circumferential ridges to facilitate the seal" between the intraluminal graft of Lazarus and a vessel of the body. Reply 15.

Dr. Samuels disagrees and argues that TriVascular has not provided an apparent reason to modify Lazarus. Resp. 22. Dr. Samuels also argues

22

IPR2013-00493
Patent 6,007,575

that TriVascular has not explained how the combination of Lazarus and Todd would have inflatable circumferential ridges, and that TriVascular relies improperly on Todd "to meet the limitations of inflatable protrusion(s) including at least one circumferential ridge." *Id.* at 24.

We agree with Dr. Samuels that Trivascular has failed to establish that the combination of Lazarus and Todd includes the claim limitation "inflatable protrusions." As discussed previously, Trivascular has failed to persuade us that Todd discloses "inflatable protrusions." *See* section II.B.1.b *supra*. Moreover, forming the non-inflatable protuberances disclosed in Todd on the inflatable collar of Lazarus would not satisfy the requirement for "inflatable protrusions" because the protuberances would not be expandable by being filled with fluid, or be themselves inflatable. *See* section II.A.5 *supra*. TriVascular has not established, furthermore, that a person of ordinary skill in the art would have known to use, on an inflatable collar, protrusions that are themselves inflatable. *See* Ex. 2002 ¶ 4.c; Ex. 1020, 138:20–140:7, 187:11–14; Ex. 2003 ¶ 8; Ex. 1021, 82:19–21.

Upon consideration of the parties' arguments and evidence, we determine that TriVascular has not demonstrated that independent claims 1 and 14, and their dependent claims 4–6, 9–11, 13, 16, 17, and 19–21, are unpatentable as obvious over Lazarus and Todd.

III. CONCLUSION

TriVascular has not proved, by a preponderance of the evidence, that claims 1, 2, and 4–24 of the '575 Patent are unpatentable. TriVascular has

23

IPR2013-00493
Patent 6,007,575

not proved that claims 1, 2, 6–15, and 18–24 would have been obvious over Samuels '851 and Todd, or that claims 1, 4–6, 9–11, 13, 14, 16, 17, and 19–21 would have been obvious over Lazarus and Todd.  Accordingly, Dr. Samuels's Motion to Amend, which is contingent on claims 1, 14, and 23 being found unpatentable, is moot.

IV.   ORDER

For the reasons given, it is

ORDERED that claims 1, 2, and 4–24 of U.S. Patent No. 6,007,575 are not determined to be unpatentable; and

FURTHER ORDERED that Dr. Samuels's Motion to Amend is *dismissed* as moot.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

24

IPR2013-00493
Patent 6,007,575


For the PETITIONER:

Daniel A. Scola, Jr.
dscola@hbiplaw.com

Michael I. Chakansky
mchakansky@hbiplaw.com


For the PATENT OWNER:

Everett Diederiks
ediederiks@dwpatentlaw.com

James D. Petruzzi
jpetruzzi@masonpetruzzi.com

25

Trials@uspto.gov                                            Paper 47
Tel: 571-272-7822                               Entered: January 29, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

TRIVASCULAR, INC.,
Petitioner,

v.

SHAUN L.W. SAMUELS,
Patent Owner.

_____

Case IPR2013-00493
Patent 6,007,575

_____

Before TONI R. SCHEINER, RICHARD E. RICE, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*

RICE, *Administrative Patent Judge.*

DECISION
Petitioner's Request for Rehearing
*37 C.F.R. § 42.71(d)*

IPR2013-00493
Patent 6,007,575

# I.  SUMMARY

Petitioner TriVascular, Inc. ("TriVascular"), in its Rehearing Request
(Paper 46, "Req. Reh'g"), asserts that, by applying an incorrect claim
interpretation, we erroneously determined in the Final Decision (Paper 45,
"Dec.") that claims 1, 2, 6–15, and 18–24 of U.S. Patent No. 6,007,575
(Ex. 1001, "the '575 Patent") are not unpatentable for obviousness over
Samuels '851[1] and Todd.[2]  TriVascular also asserts that our determination is
erroneous because we misapprehended or overlooked the state of the prior
art.  For the reasons discussed below, TriVascular's Rehearing Request is
*denied*.

# II. STANDARD OF REVIEW

A request for rehearing must identify specifically all matters the party
believes we misapprehended or overlooked, and the place where each matter
was addressed previously in a motion, an opposition, or a reply.  37 C.F.R.
§ 42.71(d); *see also* 37 C.F.R. § 42.23(b) (stating that a reply may only
respond to arguments raised in the corresponding opposition or patent owner
response).

---

[1] US 5,423,851 (Ex. 1002).

[2] US 5,423,745 (Ex. 1008).

2

## III. ANALYSIS

### A. *"Circumferential Ridge Disposed About The Inflatable Cuff"*

#### 1. *Broadest Reasonable Interpretation*

TriVascular asserts error in our determination, discussed in the Institution Decision (Paper 10, "Inst. Dec.") and maintained in our Final Decision, that the broadest reasonable interpretation consistent with the Specification of a "circumferential *ridge* disposed about the inflatable cuff" is a *raised strip* disposed circumferentially about the outer surface of the inflatable cuff. Req. Reh'g 2–8 (emphasis added) (citing Dec. 5–6); *see* Inst. Dec. 8–9. As discussed below, TriVascular argues that our interpretation of a "ridge" as a "raised strip" improperly requires a "continuous" ridge. *See* Req. Reh'g 3.

In the Institution Decision, we considered TriVascular's proposed claim construction that a "circumferential ridge disposed about the inflatable cuff" is "an elevated part of the outer surface disposed about the inflatable cuff." Inst. Dec. 8–9 (citing Pet. 10). We did not adopt TriVascular's proposal because it was inconsistent with the Specification's description of "circumferential ridges 25" as raised strips disposed about the circumference of outer surface 23 of inflatable cuff 17. *Id.* at 9 (citing Ex. 1001, 3:32–33, 54, Figs. 1 & 2). We determined that the description of a "ridge" as a raised strip "accords with the ordinary and customary meaning of the word 'ridge' as 'a raised strip (as of plowed ground).'" *Id.* (citing Ex. 1014 (WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1986)), 1014). For those reasons, we interpreted a "circumferential ridge disposed about the inflatable cuff" to

3

IPR2013-00493
Patent 6,007,575

mean a "raised strip disposed circumferentially about the outer surface of the inflatable cuff." *Id.*

In the Final Decision, we maintained our interpretation of "circumferential ridge disposed about the inflatable cuff" based on our understanding that neither party contested it, and that no evidence in the full record compelled a different interpretation. Dec. 5–6. TriVascular now contends that we overlooked or misapprehended its argument that the claim term "'circumferential ridge' includes both 'continuous' and 'discontinuous' circumferential ridges." Req. Reh'g 2 (citing Pet. 14–15, 27 (claim chart, element 1a-3); Pet. Reply 5–7). We have considered TriVascular's contention, but we are not persuaded that we overlooked or misapprehended any argument.

In the Petition, TriVascular asserted that "the phrase '<u>continuous</u> circumferential ridge,' which was used to overcome Samuels '851 [during patent prosecution], is not present in any of the . . . claims for which *inter partes* review is requested." Pet. 15. In the Reply, TriVascular similarly asserted that "Patent Owner did not argue that elements 12 and 18 [of Samuels '851] did not form 'a circumferential ridge,' only that elements 12 and 18 did not form a *continuous* circumferential ridge and amended the claims to avoid same." Reply 7. TriVascular argued that:

> "Thus, [the] Samuels '575 claims, which must be given their broadest reasonable construction absent these limitations, must be construed as follows: (i) elements 12 and 18 of Samuels '851 are 'inflatable protrusions' with or without barbs, with or without non-inflatable ridges, and that (ii) elements 12 and 18 of Samuels '851 form inflatable circumferential ridges.

4

IPR2013-00493
Patent 6,007,575

*Id.* TriVascular, however, did not explain in the Reply how its arguments relating to the prosecution history and Samuels '851 might bear on either its proposed claim construction as set forth in the Petition, or our interpretation of a "ridge" as a "raised strip."  We determine that TriVascular's Reply did not contest distinctly our determination in the Institution Decision that the broadest reasonable interpretation of a "circumferential ridge disposed about the inflatable cuff" is a raised strip disposed circumferentially about the outer surface of the inflatable cuff.

In any event, TriVascular's arguments would not be persuasive even if we set aside the procedural infirmities.  TriVascular's argument that the term "'circumferential ridge' includes both 'continuous' and 'discontinuous' circumferential ridges" is unpersuasive because it does not inform the meaning of the term "circumferential ridge."  The only construction that TriVascular proposed for the term "circumferential ridge" is "an elevated part of the outer surface."  *See* Pet. 9–10.  We disagree with that proposed claim construction for the reasons stated above.

Further, TriVascular's arguments focus on the patent applicant's "Amendment B" in isolation (*see* Req. Reh'g 7 (citing Ex. 1012, 84–85)), and are unpersuasive in view of the subsequent prosecution history, which shows that the positions of the Examiner and the patent applicant changed following a telephone interview between applicant and Examiner referenced in "Amendment C."  *See* Ex. 1012, 94–96, 98.  Ultimately, an Examiner's Amendment was entered deleting claim 26 and substituting a new claim (which issued as patent claim 23) and included the limitation "at least one

5

circumferential ridge disposed about the inflatable cuff" and omitted the "continuously" language of Amendment B. *Id.* at 98.

Upon consideration of TriVascular's arguments and the complete prosecution history, we are not persuaded of any error in our claim interpretation.

### 2. *"Circumferential Ridge" Limitation and Samuels '851*

TriVascular asserts error in our determination that "TriVascular has not established that a person of ordinary skill in the art would have known to use, on an inflatable cuff, circumferential ridges that are themselves inflatable.'" Req. Reh'g 8 (quoting Dec. 20). More specifically, TriVascular argues that our determination is incorrect because Samuels '851, which is prior art to the challenged claims, allegedly discloses "at least one circumferential ridge disposed about the inflatable cuff" (hereinafter referred to as the "'circumferential ridge' limitation"). *Id.* at 3–5, 8–10. TriVascular, however, did not argue, much less establish, that Samuels '851 discloses a raised strip disposed circumferentially about the outer surface of an inflatable cuff, as required by our claim interpretation. Accordingly, TriVascular's arguments are not persuasive.

TriVascular argues that we decided "that the prior art Samuels '851 did not disclose a 'circumferential ridge' because the inflatable protuberances of Samuels '851 were not continuous and thus did not form a continuous circumferential ridge." *Id.* at 3. TriVascular provides no citation to where we purportedly made that decision. In the Institution Decision, we analyzed the "circumferential ridge" limitation in the context of

6

IPR2013-00493
Patent 6,007,575

TriVascular's challenge to claims 1, 2, 6–15, and 18–24 as anticipated or obvious over Samuels '851. Inst. Dec. 22–23. We stated that Samuels '851 does not disclose or suggest the "circumferential ridge" limitation because "recesses 12 do not form a *raised strip*," as required by our claim interpretation. *Id.* at 22 (emphasis added). TriVascular's argument mischaracterizes our analysis.

We are not persuaded that we misapprehended or overlooked any matter in the Final Decision relating to Samuels '851. TriVascular did not show that Samuels '851 discloses "at least one circumferential ridge disposed about the inflatable cuff." Nor did TriVascular show that a person of ordinary skill in the art, in view of Samuels '851 and Todd, would have known to use, on an inflatable cuff, circumferential ridges that are themselves inflatable.

### B. The State Of The Prior Art

TriVascular also asserts that we "misapprehended or overlooked the state of the prior art, especially as it relates to an inflatable protrusion(s) including at least one circumferential ridge disposed on an inflatable cuff." Req. Reh'g 10. TriVascular argues that "[t]he state of the prior art is expressly exemplified by Rogers '024[3] and Holman '537.[4]" *Id.* at 11.

In the Rehearing Request, TriVascular argues that Rogers '024 and Holman '537 both disclose "inflatable ridges." *Id.* at 11. TriVascular

---

[3] US 5,534,024 (Ex. 1003).

[4] US 5,871,537 (Ex. 1011).

7

IPR2013-00493
Patent 6,007,575

further argues that the challenged claims would have been obvious over Samuels '851 and Todd, in view of the state of the art:

> [W]hen the state of the art is considered, . . . it would have been obvious to either (i) modify the non-continuous circumferential ridges (inflatable protrusions) of Samuels '851 based on the teachings of Todd '745 to make them continuous in order to enhance gripping without the need for barbs; or (ii) to take the circumferential ridges of Todd '745 (Ex 1008), make them inflatable and substitute them for the inflatable protrusions of Samuels '851.

*Id.* Additionally, TriVascular argues that: (1) "[i]n light of Roger[s] '024's use of inflatable protrusions for maintaining the stenting graft in position, it would have been obvious to adapt Todd '745's ridges to be inflatable (if they are not already inflatable) when used with Samuels '851" (*id.* at 13) and (2) "[i]n light of Holman '537's continuous inflatable ridge(s), it would have been obvious to either: (i) modify Samuels '851's inflatable protrusions to be continuous; or (ii) adapt Todd '745's continuous circumferential ridges to be inflatable when used with Samuels '851" (*id.* at 15). TriVascular does not indicate, however, where these arguments were made previously.

Contrary to TriVascular's arguments, we fully considered the evidence of record, including Rogers '024 and Holman '537, in determining that TriVascular had failed to demonstrate that claims 1, 2, 6–15, and 18–24 were unpatentable for obviousness over Samuels '851 and Todd. For example, we determined that TriVascular "ha[d] not established that a person of ordinary skill in the art would have known to use, *on an inflatable cuff, circumferential ridges that are themselves inflatable*." Dec. 20

8

IPR2013-00493
Patent 6,007,575

(emphasis added).  Rather, we determined that the evidence of record was to the contrary.  *Id.* (citations omitted).

We considered expressly Rogers '024 in the Institution Decision. Inst. Dec. 23.  We determined that Rogers '024 does not disclose or suggest "at least one circumferential ridge disposed about the inflatable cuff" under our claim interpretation requiring a raised strip circumferentially disposed about the outer surface of an inflatable cuff.  *Id.*  TriVascular's argument in the Rehearing Request that Rogers '024 discloses inflatable ridges does not address our previous determination.

Trivascular argues that Holman '537 discloses "continuous inflatable ridge(s)" (Req. Reh'g  15), but does not indicate where it previously raised that issue.  We note that TriVascular's Claim Chart in the Petition did not cite Holman for the limitation "inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff."  Pet. 40–41 (claim chart, element 1a-3).  A request for rehearing is not an opportunity to supplement the record and to raise issues for the first time.  *See* 37 C.F.R. § 42.71(d).

Upon consideration of TriVascular's arguments, we are not persuaded that we misapprehended or overlooked any matter in the Final Decision relating to the state of the prior art.

## III. ORDER

It is hereby ORDERED that TriVascular's Rehearing Request is *denied*.

9

IPR2013-00493
Patent 6,007,575

For the PETITIONER:

Daniel A. Scola, Jr.
dscola@hbiplaw.com

Michael I. Chakansky
mchakansky@hbiplaw.com

For the PATENT OWNER:

Everett Diederiks
ediederiks@dwpatentlaw.com

James D. Petruzzi
jpetruzzi@masonpetruzzi.com



US006007575A

# United States Patent [19]

## Samuels

[11] **Patent Number:** **6,007,575**

[45] **Date of Patent:** **Dec. 28, 1999**

[54] **INFLATABLE INTRALUMINAL STENT AND METHOD FOR AFFIXING SAME WITHIN THE HUMAN BODY**

[76] Inventor: **Shaun Laurence Wilkie Samuels,** 1055 Sonoma Ave., Menlo Park, Calif. 94025

[21] Appl. No.: **08/870,745**

[22] Filed: **Jun. 6, 1997**

[51] **Int. Cl.**[6] .............................. **A61F 2/02**; A61F 2/04; A61F 2/06; A61M 39/00

[52] **U.S. Cl.** ................................. **623/1**; 623/11; 623/12; 606/192; 606/194; 606/195; 606/198

[58] **Field of Search** .................................. 623/1, 12, 11; 606/192, 194, 195, 198

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,156,620  10/1992  Pigott ........................................... 623/1

| | | | |
|---|---|---|---|
| 5,370,691 | 12/1994 | Samson | 623/12 |
| 5,494,029 | 2/1996 | Lane et al. | 128/207.15 |
| 5,554,180 | 9/1996 | Turk | 623/1 |
| 5,554,185 | 9/1996 | Block et al. | 623/2 |
| 5,649,978 | 7/1997 | Samson | 623/12 |

*Primary Examiner*—Paul B. Prebilic
*Assistant Examiner*—Choon P. Koh
*Attorney, Agent, or Firm*—Rudnick & Wolfe

[57] **ABSTRACT**

An inflatable intraluminal stent for attachment to the interior surface of a tubular structure within the human body is disclosed. The stent features a cuff having an inflatable chamber and a friction-enhancing outer surface. The friction-enhancing outer surface engages the interior surface of the tubular structure without penetration when the inflatable cuff is in an inflated condition. An intraluminal medical device may be attached to the inner surface of the stent. A valve is integral with the inflatable cuff and allows for the inflation, deflation and sealing of the inflatable cuff.

**24 Claims, 10 Drawing Sheets**



TRIVASCULAR EXHIBIT 1001



FIG. 1



FIG. 2



FIG. 3

FIG. 4a



FIG. 4b





FIG. 7



FIG. 8

    TRIVASCULAR EXHIBIT 1001



FIG. 9a



**FIG. 9b**

TRIVASCULAR EXHIBIT 1001

Case: 15-1631    Document: 14    Page: 117    Filed: 07/06/2015



FIG. 9c

6,007,575

1

# INFLATABLE INTRALUMINAL STENT AND METHOD FOR AFFIXING SAME WITHIN THE HUMAN BODY

## BACKGROUND

Various tubular structures within the human body, such as the biliary duct system, excretory system and vascular system, may deteriorate so that medical repair is necessary. For example, weaknesses in the walls of the tubular structures or deteriorative diseases may affect the ability of the tubular structures to conduct fluids and, in turn, may be life threatening. Surgical and interventional radiological techniques have been a primary means of providing treatment for such problems. Such surgical and interventional radiological techniques involve inserting a catheter and other medical devices into the tubular structures through an incision in the patient's skin.

As an example, degenerative effects on blood vessels may cause a narrowing or constriction of the lumen of the vessel so that blood flow is restricted. Such a condition is known as "stenosis". Treatment of stenosis involves the use a stent to permanently widen the portion of the vessel that is obstructed.

The use of stents in the treatment of stenosis is well known. Stents are tubular bodies having a diameter which may be increased once they are properly positioned within the tubular structure. There are a variety of different stent designs, but by far most are made of metal wire or ribbon. The most widely used method of deploying a stent involves the use of a dilation catheter having an inflatable balloon at its distal end. The stent, its diameter at a minimum, is positioned over the uninflated balloon portion of the dilation catheter. With the aid of fluoroscopy, the physician then positions the catheter and stent at the proper location within the tubular structure. The balloon is then expanded which in turn expands the stent in a radial fashion so that the stent, now having an enlarged diameter, supports the wall of the tubular structure. Next, the balloon is deflated and the catheter is removed. By virtue of its deformable metal construction, the stent remains positioned in tension against, and in support of the tubular structure wail upon removal of the balloon and catheter.

Problems exist with such an arrangement, however, in that the irregular surfaces of most metallic stents are likely to damage the endothelial walls of healthy arteries during delivery. Furthermore, once the stent is positioned, repositioning is difficult if not impossible. To further complicate matters, misplacement of the stent can lead to catastrophic results such as the complete occlusion of the tubular structure. Finally, the stent may ultimately loose its tension against the wall and migrate to an undesired location.

Some stent designs feature anchoring pins, surgical staple-like clips or exposed barbs to secure the stent to the tube walls via penetration of the walls. Damage to the tubular wall may occur when a such device is being positioned within the tube. Furthermore, repositioning of such stents cannot be accomplished without damaging tube walls.

Due to the above problems, extensive fluoroscopic examination is required to ensure the correct placement of existing stent designs to minimize the risk of misplacement and tissue damage.

Accordingly, it is an objective of the present invention to provide a stent, and a method of placing it, that allows for repositioning of the stent within a tubular structure of the body. It is also an object of the present invention to provide

2

a stent, and a method of placing it, that allows for the stent to be affixed to the tubular structure inner walls in a manner that prevents both damage to the walls and migration of the stent after it has been affixed.

A further problem with existing stent designs is that they do not allow for the stent to be used to secure other medical devices to the tube walls. Many interventional radiology procedures require the insertion of medical devices, other than a stent, into the lumen of the tubular structures of a patient.

As an example, aneurysms may occur in blood vessels having weakened walls. An aneurysm is a ballooning of the wall of an artery. Left untreated, the aneurysm will frequently rupture resulting in a loss of blood through the rupture. Aneurysm repair involves inserting a vascular prosthesis, also known as a graft or stent-graft, into the lumen of the damaged vessel to reconstruct the section that is in need of repair. Such grafts must be anchored within the lumen of the blood vessel at the location of the aneurysm. The utility of a stent would be greatly increased if it could be used for such a purpose.

As such, it is also an object of the present invention to provide a stent that may be utilized to secure other medical devices to the inner walls of the tubular structure.

## SUMMARY

The present invention is directed to an inflatable intraluminal stent and a method of among it to the interior surface of a tubular structure within the human body as a means of treating conditions such as stenosis. Intraluminal medical devices may also be attached to the inner surface of the stent. The stent of the present invention features an inflatable cuff having an inner surface, an outer surface, and an inlet and an outlet with a lumen extending therebetween. The outer surface has a friction-enhancing face that engages the interior surface of the tubular structure, without penetrating it, when the inflatable cuff is deployed.

If the initial placement of the stent within the tubular structure is not optimal, it may be deflated, repositioned to the optimal position and reinflated so as to again be affixed to the tubular walls via its outer surface. The tissue of the walls is not damaged or harmed by its exposure to the friction-enhancing face of the stent outer surface.

The stent is inflated with an inflation material that may contain a hardening agent. A valve, which is integral with the stent, allows it to be sealed in an inflated condition after it is placed in the proper position.

A number of the stents may be joined together so as to form a multi-ring stent. Such an arrangement may be used to affix medical devices which require more support due to their length or in situations requiring a stent of a length greater than the length of a single stent.

For a more complete understanding of the nature and scope of the invention, reference may now be had to the following detailed description of embodiments thereof taken in conjunction with the appended claims and accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a perspective view of an embodiment of the stent of the present invention;

FIG. 2 shows a vertical sectional view of the stent of FIG. 1 taken along line 1—1;

FIG. 3 shows a perspective view of another embodiment of the stent of the present invention;

TRIVASCULAR EXHIBIT 1001

6,007,575

3

FIGS. 4a and 4b are enlarged partially broken away perspective views showing the detail of the mitre valve and breakaway valve connections of the stent of FIG. 1 in engaged and disengaged positions, respectively;

FIGS. 5a through 5d show in cross-section a constricted blood vessel with an elevational view of the stent of FIG. 1 being deployed therein in accordance with the method of the present invention;

FIGS. 6a through 6d show cross-sectional views corresponding to FIGS. 5a through 5b taken along line 2—2;

FIG. 7 shows a cross-sectional view of a blood vessel with an aneurysm and a stent-graft utilizing the stent of the present invention;

FIG. 8 shows a cross sectional view of an inferior vena cava with a filter disposed therein via the stent of the present invention;

FIGS. 9a through 9c show partial section, elevation and perspective views of another embodiment of the stent of the present invention, and the method of deploying the stent in accordance with the present invention, wherein multiple stents of the type of FIG. 1 are connected in a gang arrangement.

DESCRIPTION

Referring to FIG. 1, an embodiment of the inflatable intraluminal stent of the present invention is indicated generally at 5. The stent 5, shown in its inflated and deployed configuration, is a hollow cylinder and features an inlet 7, an outlet 9 and a lumen 15 extending between inlet 7 and outlet 9. The lumen of the stent is defined by an inflatable cuff; indicated generally at 17, having an inner surface 19 and an outer surface 23.

As shown in FIG. 1, outer surface 23 features a number of inflatable ridges 25 disposed about its circumference. While inflatable ridges are shown in the FIGS., any friction-enhancing outer surface, that would secure the inflated stent to the interior wall of a tubular structure without penetrating it, could be used. For example, the surface could feature nubs, bumps, indentations, etc.. As will be shown later, medical device may be secured to inner surface 19 of cuff 17 by way of biologically inert adhesives.

Inflatable cuff 17 is manufactured to the appropriate diameter and width to support or simulate the wall of, or to support a medical device within, the desired tubular structure of the patient. Inflatable cuff 17 is preferably constructed by extrusion and is drawn so as to have a low profile when viewed down the axis of the center of the ring defining cuff 17. Also, inflatable cuff 17 and its outer surface 23 are preferably composed of a polymeric plastic which is biologically inert. The material of cuff 17 must be able to withstand high inflation pressures and must be of sufficient durability to provide for decades of effective use within the body.

As illustrated in FIG. 2, circumferential ridges 25 are in fluid communication with the inflatable chamber 27 of cuff 17. Spot welds 28, positioned incrementally about the circumference and parallel with the longitudinal axis of cuff 17, prevent distention of the flat portions of the outer surface 23 of cuff 17.

As an example of an alternative friction-enhancing surface, another embodiment of the stent of the invention is shown in FIG. 3. As illustrated in FIG. 3, the outer surface 30 of the cuff is made coarse by a combination of raised portions 31 and lowered portions 33. These surface features allow the inflated stent to grip the interior walls of a tubular structure with a force that is sufficient to prevent its migration.

4

In addition, it may be desirable in some applications to provide the cuff with an outer surface that promotes tissue ingrowth. This would allow the stent to become more integrated, and thus more firmly affixed, within the tubular structure as time progresses. Such a surface could be provided by combining a friction-enhancing surface, as discussed above, with a surface material such as TEFLON.

The cuff 17 is inflated and deflated by means of a valve, indicated generally at 37 in FIGS. 4a and 4b, which is integral with inflation port 39 of cuff 17. Preferably, valve 37 combines a breakaway valve 43 with a "duck bill" or "mitre" valve 45. Mitre valve 45 features opposing leaflets 51 and 53 which are constructed of a non-elastomeric, biologically inert material. Breakaway valve 43 features a circumferential rim 55 formed upon the interior surface of inflation port 39. Inflation tubing 61 features mating end 63 and circumferential notch 65. As shown in FIG. 4a, when inflation tubing 61 is in an engaged configuration with valve 37, mating end 63 separates opposing leaflets 51 and 53 so that cuff 17 may be inflated or deflated. When in this configuration, circumferential notch 65 engages circumferential rim 55 so as to secure inflation tubing 61 within inflation port 39.

Referring to FIG. 4b, once cuff 17 has been inflated (or deflated) to the desired level, a sharp tug on inflation tubing 61 in a direction away from inflation port 39 causes circumferential notch 65 and circumferential rim 55 to disengage. This allows easy withdrawal of mating end 63 from mitre valve 45 and inflation port 39. Upon withdrawal of the mating end 63 of inflation tubing 61, as shown in FIG. 3b, opposing leaflets 51 and 53 of mitre valve 45 close to seal the inflated cuff 17.

Referring back to FIG. 1, cuff 17 is inflated by way of an inflation syringe 71 with an inflation material 73. The inflation material could be a saline-based fluid or a material that contains a photo-activated or heat-activated hardening agent or any hardening agent that hardens over time. Typically, the inflation syringe 71 is mounted in a screw-feed pressure generating device provided with a manometer in order to accurately gauge inflation pressures. After cuff 17 has been installed and inflated, the material 73 hardens over time to permanently affix stent 5 within the tubular structure of the body via circumferential ridges 25.

FIGS. 5a through 5d, and corresponding FIGS. 6a through 6d, illustrate the steps to be performed in deploying the stent of the present invention in accordance with the method of the present invention. Referring to FIGS. 5a and 6a, a guide wire 81 is initially fed from outside of the patient's body, through an incision and finally, through the constricted portion 83 of a blood vessel 85.

Once guide wire 81 is in place, catheter 87, with stent 89 collapsed over it, is advanced along guide wire 81 so as to become positioned at the constricted portion 83 of blood vessel 85, as shown in FIGS. 5b and 6b. Inflation tubing, not shown in this view, is located within catheter 87 and is connected to stent 89 by the valve arrangement described in connection with FIGS. 4a and 4b. Stent 89 is then inflated using the technique described above. As shown in FIGS. 5c and 6c, stent 89 is inflated so that the size of the lumen of stent 89 approximates the lumen size of the original, unconstricted blood vessel. By doing so, constricted portion 83 is compressed between blood vessel wall 85 and stent 89, the latter of which is fixed in place by way of protruding ridges 91.

A unique feature of the present invention is its capability of being optimally positioned within a tubular structure in

TRIVASCULAR EXHIBIT 1001

6,007,575

5

the body (in this case, a blood vessel) without causing damage to the surrounding tissue. Specifically, after stent 89 has been inflated so that ridges 91 affix the stent to the tubular walls without penetration, the position of the stent is examined fluoroscopically to determine if it is optimal. If not, stent 89 may be deflated, repositioned and then reinflated. It is important to note that the tissue of the vessel walls is not damaged by exposure to ridges 91 of the stent.

As the final step of the procedure, as shown in FIGS. 5d and 6d, catheter 87 is removed from stent 89 so that the former may be removed from the blood vessel. As discussed in reference to FIGS. 4a and 4b, breakaway and mitre valves allow the inflation tubing within catheter 87 to be removed from the stent so that the stent may be sealed in an inflated condition. Finally, guidewire 81 is removed from the blood vessel.

Note that utilization of the stent and method of the present invention for the treatment of stenosis is presented only as an example of its potential applications. A non-exhaustive list of other applications includes: placing filters in the inferior vena cava, use of the stent in the vascular or biliary system to maintain the patency of the respective tubular structures and endoarterial grafts via a percutaneous approach. In order to accommodate some of these applications, as stated earlier, an intraluminal medical device may be attached to the interior surface of the stent of the present invention.

As an illustration, FIG. 7 shows a stent-graft utilizing the stent of the present invention to treat an aneurysm. A graft 92 is held by its end portions to the interior surfaces of stents 94, shown in an inflated condition, by biologically inert adhesive 95. The stent-graft is secured to the vessel walls via ridges 96 so that blood passes through graft 92.

As another example, FIG. 8 shows a filter 97 disposed within the inferior vena cava via the stent of the present invention. Filter 97 is attached to the interior surface of stent 98. Stent 98, shown in an inflated condition, is held within the inferior vena cava by ridges 99. In some applications, it may be desirable to temporarily place filter 98 in the inferior vena cave The stent of the present invention is perfectly suited to such an application in that it can be deflated for retrieval without damaging the interior walls of the inferior vena cava. In such instances, stent 98 is inflated with a saline-based material that does not contain a hardening agent. This allows for easy deflation of stent 98 for retrieval. During the retrieval process, stent 98 is deflated and the inflation stalk 100 is snared with a separate device. The stent and attached filter may then removed from the inferior vena cava.

Referring to FIGS. 9a through 9c, a ganged arrangement of four inflatable stents, 101 through 104, is shown. Each of the stents is similar in construction to stent 5 of FIG. 1. Such an arrangement preferably is used to affix medical devices which require more support due to their length, such as long tubes or endo-arterial grafts. Alternatively, the ganged arrangement may be utilized in situations requiring a stent of a length greater than the length a single cuff. Examples include colonic or esophageal stents. FIGS. 9a through 9c also show how such a ganged arrangement may be deployed in accordance with the method of the present invention.

FIG. 9a shows the multi-ring stent collapsed over deployment catheter 111. FIG. 9a also illustrates that, via a partial sectional view of catheter 111, inflation tubing 115 is located within catheter 111 and connected at one end to stent 101 via port 123. Stent 101 features breakaway and mitre valves (not shown) of the type illustrated in FIGS. 4a and 4b within its

6

port 123. As will be shown below, stents 101 through 104 are in fluid communication with one another. The opposing end of inflation tubing 115 is connected to inflation syringe 117 which is filled with inflation material 119.

FIG. 9b illustrates the multi-ring stent in an inflated condition, such as would be desired once the stent is properly positioned within the tubular structure of a patient. Connecting inflation tubing 125 interconnects stents 101 through 104 so that all four stents can be simultaneously inflated. The inflation tubing 125 and stents 101 through 104 are formed into an integral construction by fastening the stents to the inflation tubing, the latter of which is initially provided with apertures (not shown) for conveying fluid into the cuffs. Fastening may be performed using a biologically inert adhesive, thermal welding or any other suitable fastening method. In the configuration shown in FIG. 9b, inflation material 119 has been injected into stents 101 through 104 by manipulation of inflation syringe 117. Stents 101 through 104 are also secured together by stabilizing bridging wire 127 so as the enhance the integrity of the multi-ring stent. Note that tape may be used in place of wire 127.

FIG. 9c shows the inflated multi-ring stent after catheter 111 has been pulled away so that catheter 111 may be removed from the tubular structure of the patient. As the catheter is pulled away, the breakaway valve within port 123 releases inflation tubing 115 and the mitre valve seals port 123 in a manner similar to the one illustrated in FIG. 4b. As a result, inflation material 119 cannot escape from the multi-ring stent.

The present invention can be constructed in many different sizes and shapes. The only criterion which must be met is that the stent must be of an appropriate width and diameter so that the tubular wall may be simulated or supported by the stent or the medical device to be used can be fully supported within the tubular structure by the stent. Not only can the invention be practiced in small structures such as the vascular system, but also, the stent may be affixed within much larger structures such as the excretory system.

While the preferred embodiments of the invention have been shown and described, it will be apparent to those skilled in the art that changes and modifications may be made therein without departing from the spirit of the invention, the scope of which is defined by the appended claims.

What is claimed is:

1. An inflatable intraluminal stent adapted to be secured to the interior of a tubular structure within the human body comprising:

a) an inflatable and deflatable cuff of generally hollow cylindrical continuation having a collapsible lumen, an inner surface, an inlet, an outlet and a friction enhancing outer surface, said friction-enhancing outer surface featuring inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff, said friction-enhancing outer surface engaging the interior of the tubular structure without penetration to prevent the cuff from moving in a longitudinal direction with respect to the tubular structure when said cuff is in a fully inflated condition;

b) means for injecting an inflation material into said cuff to inflate it; and

c) a valve integral with the inflatable cuff for permitting entry of the inflation material from the means for injecting and thereafter sealing said cuff to prevent deflation.

    TRIVASCULAR EXHIBIT 1001

6,007,575

7

**2**. The inflatable intraluminal stent of claim **1** wherein the friction-enhancing outer surface is a coarse surface.

**3**. The inflatable intraluminal stent of claim **1** further comprising a plurality of spot welds between the inner surface and the friction-enhancing outer surface of the inflatable cuff in staggered relationship with the inflatable protrusion(s) to limit distention between the inner surface and the friction-enhancing outer surface.

**4**. The inflatable intraluminal stent of claim **1** wherein the friction-enhancing outer surface is constructed of a material that promotes tissue ingrowth.

**5**. The inflatable intraluminal stent of claim **4** wherein the material that promotes tissue ingrowth is TEFLON.

**6**. The inflatable intraluminal stent of claim **1** wherein the inflatable cuff is composed of a polymeric plastic which is biologically inert.

**7**. The inflatable intraluminal stent of claim **1** wherein the inflation material includes a hardening agent.

**8**. The inflatable intraluminal stent of claim **1** wherein the valve is a mitre valve.

**9**. The inflatable intraluminal stent of claim **1** wherein the valve is of a breakaway design to permit separation from the means for injecting.

**10**. The inflatable intraluminal stent of claim **1** further comprising means for securing an intraluminal medical device to the inner surface of the inflatable cuff.

**11**. The inflatable intraluminal stent of claim **10** wherein the intraluminal medical device is a graft for repairing aneurysms.

**12**. The inflatable intraluminal stent of claim **10** wherein the intraluminal medical device is a vena cava filter.

**13**. The inflatable intraluminal stent of claim **1** wherein the means for injecting an inflation material into said inflatable cuff to inflate it includes an inflation syringe and inflation tubing.

**14**. An apparatus for disposition within the lumen of a tubular structure within the human body comprising:

a) a cuff having a collapsible lumen, an inner surface and a friction-enhancing outer surface with an inflatable and deflatable chamber disposed therebetween, the cuff also having an inflation port in fluid communication with the inflatable chamber,

b) said friction-enhancing outer surface featuring inflatable protrusion(s) including at least one circumferential ridge disposed about the inflatable cuff and affixing the cuff with the lumen of the tubular structure without penetration of the tubular structure when the cuff is fully inflated so that movement of the cuff in a longitudinal direction with respect to the tubular structure is prevented;

8

c) means for inflating the cuff with inflation material in fluid communication with said inflation port; and

d) a valve integral with said inflation port for permitting entry of the inflation material from the means for inflating and thereafter sealing said cuff to prevent deflation.

**15**. The apparatus of claim **14** wherein the friction-enhancing outer surface is a coarse surface.

**16**. The inflatable intraluminal stent of claim **14** wherein the friction-enhancing outer surface is constructed of a material that promotes tissue ingrowth.

**17**. The inflatable intraluminal stent of claim **10** wherein the material that promotes tissue ingrowth is TEFLON.

**18**. The apparatus of claim **14** wherein the valve is a mitre valve.

**19**. The apparatus of claim **14** wherein the valve is of a breakaway design to permit separation from the means for inflating.

**20**. The apparatus of claim **14** further comprising means for securing an intraluminal medical device to the inner surface of the cuff.

**21**. The inflatable intraluminal stent of claim **20** wherein the intraluminal medical device is a graft for repairing aneurysms.

**22**. The inflatable intraluminal stent of claim **20** wherein the intraluminal medical device is a vena cava filter.

**23**. An apparatus for disposition within the lumen of a tubular structure within the lumen body comprising:

a) a plurality of cuffs, each of said plurality of cuffs having an inner surface and a friction enhancing outer surface with an inflatable chamber disposed therebetween, the inflatable chambers of said plurality of cuffs being in fluid communication with one another;

b) said friction-enhancing outer surfaces featuring inflatable protrusion(s including at least one circumferential ridge disposed about the inflatable cuff and affixing the plurality of cuffs within the lumen of the tubular structure without penetration of the tubular structure when the plurality of cuffs are inflated;

c) means for inflating the plurality of cuffs with inflation material; and

d) a valve integral with one of the plurality of cuffs for permitting entry of the inflation material from the means for inflating and thereafter sealing said cuff to prevent deflation.

**24**. The apparatus of claim **22** further comprising means for securing an intraluminal medical device to the inner surfaces of the cuffs.

* * * * *

    TRIVASCULAR EXHIBIT 1001